FILED
United States Court of Appeals
Tenth Circuit

August 3, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENCH CIRCUIT

VICTOR WAYNE HOOKS,

Petitioner-Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

Respondent-Appellee.

Nos. 03-6049, 10-6076

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. Nos. CIV-96-732-M, 5:96-CV-00732-M)

Patti Palmer Ghezzi, Assistant Federal Public Defender (T. Kenneth Lee, Assistant
Federal Public Defender, with her on the briefs), Oklahoma City, Oklahoma, for
Petitioner-Appellant.

Jennifer Crabb, Assistant Attorney General (E. Scott Pruitt, Attorney General, with her on
the brief), Oklahoma Office of the Attorney General, Oklahoma City, Oklahoma, for
Respondent-Appellee.

Before **MURPHY**, **GORSUCH**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

In this consolidated appeal, Victor Wayne Hooks, an Oklahoma state prisoner

facing the death penalty, appeals two orders of the district court denying him habeas

relief. He seeks relief on three alternative grounds: (1) he is mentally retarded[1] and thus categorically ineligible for the death penalty; (2) aspects of his mental-retardation trial ("*Atkins* trial") denied him his Fifth and Sixth Amendment rights to due process and a fair trial; and (3) his counsel was ineffective during both the guilt and sentencing phases of his original trial. Grounds 1 and 2 arise in Appeal No. 10-6076; ground 3 arises in Appeal No. 03-6049. The district court granted certificates of appealability on all claims.

Our disposition, in brief, is as follows: (1) in No. 10-6076, we **AFFIRM** the judgment of the district court denying habeas relief on all claims arising out of Mr. Hooks's *Atkins* trial; and (2) in No. 03-6049, we (a) **AFFIRM** the judgment of the district court denying habeas relief as to Mr. Hooks's 1989 conviction, but (b) **REVERSE** the judgment of the district court and conditionally grant the writ of habeas corpus as to his sentence.

---

[1] We take note of the following: In 2006, the American Association on Mental Retardation ("AAMR") changed its name to the American Association on Intellectual and Developmental Disabilities ("AAIDD"). "Intellectual disability," rather than "mental retardation," is now the preferred terminology. *See World's Oldest Organization on Intellectual Disability Has a Progressive New Name*, Am. Ass'n on Intellectual & Developmental Disabilities (Nov. 2, 2006), *available at* http://www.aamr.org/content_1314.cfm. Also, recently enacted federal legislation known as Rosa's Law, Pub. L. No. 111-256, 124 Stat. 2643 (2010), mandates the use of the term "intellectual disability" in place of "mental retardation" in all federal enactments and regulations. Nonetheless, throughout this opinion, we employ the old terminology because the legal sources relevant to our analysis, including Oklahoma law, our own prior opinions, and the opinions of the Supreme Court, use the terms "mental retardation" and "mentally retarded."

## I. Factual and Procedural Background

### A.

At the time of her death, Shalimein Blaine was the common-law wife of Victor Hooks. The couple had lived together for four years. They were the parents of a one-year-old daughter, and Ms. Blaine was twenty-four-weeks pregnant with their second child.

On the evening of October 6, 1988, Mr. Hooks left his wife's apartment and went to the home of her mother, Virginia Plumley, less than a block away. He told Ms. Plumley that Ms. Blaine had been beaten and raped and needed to be taken to the hospital. He then left. Ms. Plumley and her daughter, Amanda, followed Mr. Hooks back to the apartment, and when they arrived, they watched him load an unconscious Ms. Blaine into the car. She was unclothed and wrapped in nothing but a blanket. Ms. Plumley noticed that Ms. Blaine's arms and legs were covered in bruises, her face was swollen, and her head had been partially shaved.

As they drove to the hospital, Ms. Plumley asked Mr. Hooks what happened. He said Ms. Blaine had gone for a walk and returned two hours later, beaten and bloodied. When Ms. Plumley asked why he had shaved Ms. Blaine's head, Mr. Hooks responded that he had not done that and that it must have been done by the person who beat and raped her.

When Ms. Blaine arrived at St. Anthony Hospital in Oklahoma City, she was clinically dead. An ultrasound revealed that her unborn child was also dead, with a

ruptured liver and bruising on its abdomen and head due to blunt-force trauma. Although doctors were initially able to reestablish Ms. Blaine's heartbeat and pulse, she was pronounced officially dead the following morning.

After preliminary questioning by Oklahoma City police officers, Mr. Hooks agreed to let the officers search Ms. Blaine's apartment. There, they discovered blood on the bed, on the carpet near the bed, and on several wash cloths and towels in a clothes hamper. They also found some hair in a trash can in the apartment. A search of a nearby dumpster revealed more bloody wash cloths, bloody clothing, and a large clump of hair.

Police brought Mr. Hooks to the Oklahoma City police station, where he was questioned by Detectives Eric Mullenix and Randy Scott. Mr. Hooks initially told detectives that Ms. Blaine had left the apartment for a walk, returned home, knocked on the door, and fell into his arms when he answered. He claimed she had been beaten and raped. According to Mr. Hooks, he then left the apartment to notify Ms. Plumley, and when he returned, Ms. Blaine was in the bathtub. He wrapped her in a blanket and took her to the hospital.

When detectives confronted Mr. Hooks with the bloody items and hair they had found, he began to cry and said he wanted to tell the truth. He told detectives that he and Ms. Blaine had been fighting: Ms. Blaine slapped him, and he then struck her, knocked her to the ground, and began kicking her in the stomach and face. He subsequently removed her clothing, placed her in the bathtub, and shaved a portion of her head. He did this, he claimed, because he was looking for head injuries. He then cleaned up the

apartment. He also removed the blood from his one-year-old daughter, who had gotten it on her in the course of her mother's beating. He placed the bloody clothing and clump of hair in the nearby dumpster.

**B.**

Mr. Hooks was charged by information in October 1988 with murder in the first degree of Shalimein Blaine and with manslaughter in the first degree for the death of the unborn quick child. At his trial in the District Court of Oklahoma County, Oklahoma, he was represented by Ronald Evans, a private attorney retained by Mr. Hooks's mother, Clara Hooks. Mr. Evans, after consulting with experts, decided not to pursue an insanity defense, believing there was an insufficient factual basis for it. Instead, and in light of Mr. Hooks's confession, he focused on obtaining a conviction for the lesser-included offense of second-degree murder or first-degree manslaughter with respect to Ms. Blaine. He sought to show that Mr. Hooks had acted in the heat of passion or with a depraved mind, not with malice aforethought.

The trial court, however, refused to instruct the jury on the lesser-included offenses. On May 10, 1989, the jury found Mr. Hooks guilty of first-degree murder with respect to Ms. Blaine and first-degree manslaughter with respect to the unborn quick child. After a relatively brief sentencing phase, the jury sentenced Mr. Hooks to death for the crime of first-degree murder and to five hundred years' imprisonment for the crime of first-degree manslaughter. The court entered judgment and sentenced Mr. Hooks accordingly.

Post-trial proceedings followed a long and serpentine path through the state and federal judicial systems, which we briefly review below. To summarize, we have consolidated two separate appeals for our review. The first, No. 03-6049, concerns claims of ineffective assistance of trial counsel pertaining to both the guilt and sentencing phases of Mr. Hooks's original trial. The second, No. 10-6076, involves several claims arising out of a subsequent trial in Oklahoma district court on whether Mr. Hooks is mentally retarded.

**1.**

Mr. Hooks's conviction and sentence were affirmed on direct appeal by the Oklahoma Court of Criminal Appeals ("OCCA"). *See Hooks v. State*, 862 P.2d 1273, 1284 (Okla. Crim. App. 1993), *cert. denied*, 511 U.S. 1100 (1994). As relevant here, Mr. Hooks claimed on direct appeal that his trial counsel was ineffective for advising him not to testify at trial—a claim that the OCCA rejected on the merits. *Id.* at 1283. Mr. Hooks then sought postconviction relief, arguing that his trial counsel was ineffective for a host of other reasons. The OCCA found these claims procedurally barred because they were not raised on direct appeal, and it denied postconviction relief. *See Hooks v. State*, 902 P.2d 1120, 1122 n.4 (Okla. Crim. App. 1995), *cert. denied*, 517 U.S. 1145 (1996).

In December 1996, Mr. Hooks filed an application for writ of habeas corpus in the United States District Court for the Western District of Oklahoma, asserting numerous claims. His claims of ineffective assistance of trial counsel encompassed the claims he had raised before the OCCA on both direct appeal and postconviction review. The

district court held an evidentiary hearing in April 1997. It subsequently denied habeas relief but granted a certificate of appealability ("COA") on the ineffective-assistance claims. *See Hooks v. Ward*, No. CIV-96-732-M (W.D. Okla. Mar. 30, 1998) [hereinafter *Hooks Habeas I*].[2]

On appeal to a panel of this court, the claims received bifurcated treatment. *See Hooks v. Ward*, 184 F.3d 1206, 1213–20 (10th Cir. 1999). With respect to the claim that trial counsel was ineffective for advising Mr. Hooks not to testify, our review was constrained by the deferential standards of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254(d). We held that the OCCA did not unreasonably apply *Strickland v. Washington*, 466 U.S. 668 (1984), when it denied the claim on the merits. 184 F.3d at 1220. As for the other allegations of ineffective assistance, to which the OCCA applied a procedural bar on postconviction review, we remanded for a determination of whether the procedural bar was adequate to preclude federal habeas review of the merits. *See id.* at 1217–18. On remand, the district court held that the procedural bar was inadequate and reaffirmed its previous ruling denying habeas relief on the merits. *Hooks v. Ward*, No. CIV-96-732-M (W.D. Okla. Jan. 27, 2003). Mr. Hooks filed a timely notice of appeal, and the district court granted a COA. The appeal was docketed at No. 03-6049.

---

[2]       This decision is attached in slip-opinion form to Mr. Hooks's opening brief as Attachment 1. Citations herein are to the slip opinion.

**2.**

In the meantime, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), in which it held that the execution of a mentally retarded person is "cruel and unusual punishment[]" prohibited by the Eighth Amendment. In December 2002, Mr. Hooks filed a second application for postconviction relief with the OCCA, alleging that his execution would violate the Eighth Amendment, pursuant to *Atkins*. We subsequently abated Appeal No. 03-6049 to allow Mr. Hooks to litigate the *Atkins* claim in state court. The OCCA remanded the matter to the Oklahoma County District Court for a jury trial on whether Mr. Hooks is mentally retarded.

In June 2004, after a six-day trial, a jury concluded that Mr. Hooks is not mentally retarded, and the OCCA upheld that determination on appeal. *See Hooks v. State*, 126 P.3d 636, 645 (Okla. Crim. App. 2005) [hereinafter *Hooks Atkins Appeal*], *cert. denied*, 547 U.S. 1078 (2006). Mr. Hooks then sought collateral relief on claims arising out of his *Atkins* trial, which the OCCA denied in an unpublished decision. *See Hooks v. State*, No. PCD-2006-350 (Okla. Crim. App. Oct. 10, 2006) [hereinafter *Hooks Atkins Collateral*].[3]

We authorized Mr. Hooks to file a second or successive habeas petition to address his *Atkins* claims. *See* Order at 2, *Hooks v. Sirmons*, Nos. 03-6049, 06-6105 (10th Cir. Mar. 31, 2006). Mr. Hooks filed his second petition in April 2006, challenging the procedures and result of the *Atkins* trial. The district court entered a stay pending the

---

[3]     This decision is attached in slip-opinion form to Mr. Hooks's opening brief as Attachment 5. Citations herein are to the slip opinion.

OCCA's collateral review of the claims. After the OCCA denied relief, Mr. Hooks filed an amended federal habeas petition in December 2006.

The district court denied habeas relief on the *Atkins* claims. *See Hooks v. Workman*, 693 F. Supp. 2d 1280, 1325 (W.D. Okla. 2010) [hereinafter *Hooks Habeas II*]. Mr. Hooks filed a notice of appeal, the district court granted a COA, and the appeal was docketed at No. 10-6076.

Appeal No. 03-6049 (the ineffective-assistance claims) and Appeal No. 10-6076 (the *Atkins* claims) have been consolidated for our review.

## II. Discussion

Mr. Hooks seeks habeas relief on three alternative grounds. With respect to his *Atkins* trial (Appeal No. 10-6076), he asserts (1) that he is mentally retarded and his execution would violate *Atkins*, and (2) that numerous procedural irregularities made his *Atkins* trial fundamentally unfair. With respect to his original trial (Appeal No. 03-6049), he asserts (3) that his counsel was ineffective during both the guilt and sentencing phases. As to grounds one and two, we agree with the district court that in light of AEDPA's deferential standard, Mr. Hooks is not entitled to habeas relief. (*See* Parts II.B. and II.C. below.) As to ground three, our review is not constrained by AEDPA. We agree with the district court that counsel was not ineffective during the guilt phase of Mr. Hooks's original trial. (*See* Part II.D.1. below.) However, we part ways with the district court regarding counsel's performance during the sentencing phase. With respect to that aspect of the claim, we reverse the district court's judgment and conditionally grant the writ.

(*See* Part II.D.2. below.)

## A. Standard of Review

AEDPA circumscribes our review of federal habeas claims that were adjudicated on the merits in state-court proceedings. *See, e.g.*, *Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011). An applicant is not entitled to relief unless he can demonstrate that the state court's resolution of his claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2); *accord Phillips v. Workman*, 604 F.3d 1202, 1209 (10th Cir. 2010). This "'highly deferential standard for evaluating state-court rulings[]' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under § 2254(d)(1), the threshold question is whether there exists clearly established federal law, an inquiry that focuses exclusively on holdings of the Supreme Court. *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) (calling Supreme Court holdings "the exclusive touchstone for clearly established federal law"). "The absence of clearly established federal law is dispositive under § 2254(d)(1)." *Id.* at 1018 (citing and discussing *Carey v. Musladin*, 549 U.S. 70 (2006)).

If clearly established federal law exists, a state-court decision is "contrary to" it "if the state court applies a rule different from the governing law set forth in [Supreme

Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state-court decision is an "unreasonable application" of clearly established federal law when the state court "identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (internal quotation marks omitted). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

Habeas relief is also warranted if the state court's adjudication of a claim on the merits "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As the plain terms of the statute indicate, we also must not stray from the record before the state court in conducting this AEDPA inquiry. Furthermore, factual findings of the state court are presumed correct unless the applicant rebuts that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *accord Welch v. Workman*, 639 F.3d 980, 991 (10th Cir. 2011). "We review the district court's legal analysis of the state court decision de novo." *Welch*, 639 F.3d at 991 (quoting *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006)) (internal quotation marks omitted).

For federal habeas claims not adjudicated on the merits in state-court proceedings, we exercise our "independent judgment" and "review the federal district court's

conclusions of law de novo." *McCracken v. Gibson*, 268 F.3d 970, 975 (10th Cir. 2001).

The district court's factual determinations are reviewed for clear error. *Id.* Any state-court findings of fact that bear upon the claim are entitled to a presumption of correctness rebuttable only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Hooks v. Ward*, 184 F.3d at 1223 (applying § 2254(e)(1)'s presumption of correctness to state-court factual findings bearing upon the claim, even though the claim was not adjudicated on the merits by the state court).

## B. Existence of Mental Retardation

Mr. Hooks first asks us to find that he is mentally retarded and that his execution is categorically prohibited by the Eighth Amendment. An Oklahoma jury (hereinafter the "*Atkins* jury") found that Mr. Hooks is not mentally retarded, and that determination was upheld by the OCCA on both direct appeal and collateral review.

The essence of Mr. Hooks's claim is a challenge to the sufficiency of the evidence. He argues:

> The [*Atkins*] jury's conclusion was based on insufficient evidence and [Mr. Hooks] separately asserts the trial evidence, coupled with the additional evidence appropriately presented in habeas, demonstrates he is so impaired [that] he falls within the range of mentally retarded offenders for which there is a national consensus against his execution.

Aplt. Opening Br. at 20–21. The OCCA rejected this legal challenge, concluding that "a rational trier of fact could have found" that Mr. Hooks failed to show, by a preponderance of the evidence, that he is mentally retarded. *Hooks Atkins Appeal*, 126 P.3d at 641.

As we will explain, the OCCA's conclusion did not contravene clearly established

-12-

federal law. We first set forth Oklahoma's standard for finding a person mentally retarded within the meaning of *Atkins*. We then explain our standard of review in the habeas context for the unique sort of sufficiency challenge that Mr. Hooks presents here. Finally, we analyze whether the OCCA contravened clearly established federal law in its decision to uphold the *Atkins* jury's finding, and we conclude that it did not.

**1.**

In *Atkins*, the Supreme Court held that in light of a national consensus and its own precedents, execution of mentally retarded criminal defendants violates the Eighth Amendment's prohibition on "cruel and unusual punishments." *See* 536 U.S. at 311, 316–21 (quoting U.S. Const. amend. VIII) (internal quotation marks omitted). The Court did not set forth a definition of mental retardation. Although it twice discussed clinical definitions of the term, *see id.* at 308 n.3, 318, it acknowledged that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus," *id.* at 317. The Court therefore left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* (alterations omitted) (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–17 (1986)) (internal quotation marks omitted).

In response to *Atkins*, the OCCA in *Murphy v. State* promulgated the following definition of mental retardation for use in capital trials:

> A person is "mentally retarded": (1) If he or she functions at a

-13-

significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work. It is the defendant's burden to prove he or she is mentally retarded by a preponderance of the evidence at trial. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative. However, no person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test.

54 P.3d 556, 567–68 (Okla. Crim. App. 2002) (footnotes omitted), *overruled in part on other grounds by Blonner v. State*, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006).[4]

Mr. Hooks does not challenge *Murphy*'s definition of mental retardation as

---

[4] The OCCA's decision in *Murphy* was a stopgap measure. The court adopted a judicial definition of mental retardation "only after the other branches of the government were unable to reach a meeting of the minds on the issue." *Murphy v. State*, --- P.3d ----, 2012 WL 1192099, at \*4 (Okla. Crim. App. Apr. 5, 2012) (citing *Murphy*, 54 P.3d at 567). In 2006, the Oklahoma legislature adopted Okla. Stat. tit. 21, § 701.10b, which sets forth a statutory definition of mental retardation and prescribes procedures for determining whether a defendant accused or convicted of capital murder is mentally retarded. *See Smith v. State*, 245 P.3d 1233, 1235 (Okla. Crim. App. 2010) ("Section 701.10b governs the death penalty and mental retardation . . . ."). Because Mr. Hooks's *Atkins* trial took place in 2004, it was governed by *Murphy*, not § 701.10b, and neither the State nor Mr. Hooks contends otherwise. *See Murphy*, 54 P.3d at 568 ("This standard shall be used at all future and pending capital trials, until such time as it may be replaced by a suitable legislative enactment."); *see also Lambert v. State*, 71 P.3d 30, 31–32 (Okla. Crim. App. 2003) (setting forth procedures for postconviction mental-retardation determination because the state legislature had not yet addressed the issue), *superseded by statute*, Okla. Stat. tit. 21, § 701.10b.

inconsistent with *Atkins*. Indeed, *Murphy*'s definition closely tracks the AAMR (now AAIDD) definition discussed in *Atkins*. *See* 536 U.S. at 308 n.3, 318.[5] Rather, Mr. Hooks argues that the jury's determination that he is not mentally retarded is based upon insufficient evidence, and that the OCCA's decision to uphold that determination was contrary to, or an unreasonable application of, *Atkins*.

**2.**

A sufficiency-of-the-evidence challenge in a habeas petition presents a mixed question of fact and law. *Brown v. Sirmons*, 515 F.3d 1072, 1089 (10th Cir. 2008). "We ask whether the facts are correct and whether the law was properly applied to the facts, 'which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas.'" *Id.* (quoting *Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006)).

The typical sufficiency challenge in a habeas petition focuses on evidence of guilt for the crime charged. In *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a pre-AEDPA decision, the Supreme Court held that such evidence is sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." In federal habeas proceedings, where a sufficiency challenge was resolved on the merits by the state

---

[5] As the district court noted, "[t]he only significant difference between Oklahoma's definition and the [AAIDD] definition is that the [AAIDD] includes a tenth possible deficit in the area of leisure." *Hooks Habeas II*, 693 F. Supp. 2d at 1290 n.4.

courts, we have held that AEDPA "adds an additional degree of deference," and the question becomes whether "the OCCA's conclusion that the evidence was sufficient constituted an unreasonable application of the *Jackson* standard." *Diestel v. Hines*, 506 F.3d 1249, 1267 (10th Cir. 2007) (quoting *Patton v. Mullin*, 425 F.3d 788, 796 (10th Cir. 2005)) (internal quotation marks omitted); *see Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (per curiam). We call this standard of review "deference squared." *Young v. Sirmons*, 486 F.3d 655, 666 n.3 (10th Cir. 2007) (quoting *Torres v. Lytle*, 461 F.3d 1303, 1313 (10th Cir. 2006)) (internal quotation marks omitted).

In two respects, however, Mr. Hooks's sufficiency challenge is somewhat atypical. First, the substantive law at the basis of his sufficiency challenge consists not of the "essential elements" of a state-law criminal offense, *Jackson*, 443 U.S. at 319, but rather of the definition of mental retardation—a definition that, although dependent on state law (here, *Murphy*), ultimately has Eighth Amendment underpinnings pursuant to *Atkins*. *See Ochoa v. Workman*, 669 F.3d 1130, 1143 (10th Cir. 2012) ("The liberty interest at issue in this case, the right of the mentally retarded to avoid execution, flows directly from the Eighth Amendment."). Thus, Mr. Hooks's sufficiency challenge inescapably requires that we consider the kinds of evidence that state courts may (or may not) rely upon in adjudicating an *Atkins* claim.

Second, the jury in Mr. Hooks's *Atkins* trial was required to determine, not whether he is guilty of an offense beyond a reasonable doubt (a question on which *the State* would have borne the burden of proof), but whether he is mentally retarded by a

preponderance of the evidence (a question on which *Mr. Hooks* bore the burden of proof).

The different standard of proof requires us to tailor *Jackson* to fit this context. We hold

that the relevant constitutional standard for the state appellate court was whether, viewing

the evidence in the light most favorable to the prevailing party (the State), any rational

trier of fact could have found Mr. Hooks *not* mentally retarded by a preponderance of the

evidence. *See Maynard*, 468 F.3d at 674. If so, Mr. Hooks's evidentiary challenge would

fail. Put a different way, if any rational trier of fact could have found that Mr. Hooks

failed to establish, by a preponderance of the evidence, that he is mentally retarded, then

the jury verdict may be upheld.[6]

---

[6]     In *Maynard*, we faced a closely analogous sufficiency-of-the-evidence challenge. In that case, the OCCA upheld a jury verdict finding the habeas applicant competent to stand trial. 468 F.3d at 668. In our own review of the OCCA's decision, we sought guidance from *Jackson* and held that "[u]nder AEDPA, a challenge to the sufficiency of the evidence must establish that no 'rational trier of fact' could have found Maynard competent by a preponderance of the evidence." *Id.* at 674 (quoting *Jackson*, 443 U.S. at 319). In a footnote, we explained that "[i]n *Jackson*, the sufficiency of the evidence was 'beyond a reasonable doubt,' because that was the evidentiary burden for the issue at trial. Competency, as we have noted, is determined based on a preponderance of the evidence standard." *Id.* at 674 n.6. That reasoning applies with equal force to this case.

We recognize that the unusual nature of Mr. Hooks's sufficiency challenge creates a semantic anomaly. In the typical case, a habeas applicant challenges the sufficiency of the evidence as to a question on which the other party—the prosecution—has the burden of proof at trial. The allegation is that the evidence was *legally insufficient* to meet the prosecution's burden. In a case like this, by contrast, the party challenging the verdict and the party that had the burden of proof at trial are the same. Strictly speaking, the challenger's allegation is not that the evidence of mental retardation was *in*sufficient, but that the evidence was *sufficient as a matter of law*, such that no reasonable factfinder could have failed to find in the applicant's favor (i.e., could have failed to find that the

(continued...)

-17-

Of course, AEDPA adds a second layer of deference to this standard. We do not directly review the jury's verdict. AEDPA limits our gaze to "the highest state court's resolution of a particular claim." *Alverson v. Workman*, 595 F.3d 1142, 1155 (10th Cir. 2010). We therefore ask whether the OCCA correctly identified the governing legal principle from *Jackson* and reasonably applied it to the facts of Mr. Hooks's case. *See Matthews v. Workman*, 577 F.3d 1175, 1183 (10th Cir. 2009) ("Because the OCCA applied the *Jackson* standard in deciding Mr. Matthews's sufficiency claim on direct review, our task is limited by AEDPA to inquiring whether the OCCA's application of *Jackson* was unreasonable." (footnote omitted)). We reiterate that under both paragraphs (1) and (2) of § 2254(d), we are precluded from considering evidence not before the OCCA. *See Pinholster*, 131 S. Ct. at 1398 (construing 28 U.S.C. § 2254(d)(1)); 28 U.S.C. § 2254(d)(2).

Based on the foregoing, we find that the OCCA's decision, on its face, applied the

------

[6](...continued)
applicant is mentally retarded). But in either case, the underlying inquiry for an appellate court is the same: In light of the facts in the record, the applicable law, and the standard of proof, was it reasonable for the factfinder to reach the conclusion it did?

For this reason, our "tailoring" of *Jackson*'s standard to meet the context of this case does not hold the OCCA to something other than clearly established federal law. Jackson's rational-trier-of-fact standard is clearly established federal law. *See Cavazos v. Smith*, 132 S. Ct. 2, 3–4, 6 (2011) (per curiam). And *Maynard* is instructive on how that standard applies in this case. A necessary, if implicit, premise of our *Maynard* decision was that *Jackson*'s rational-trier-of-fact standard is clearly established federal law even when, as here, the standard of proof is a preponderance of the evidence and the burden of proof at trial rested on the habeas applicant.

correct standard of appellate review.  Reviewing Mr. Hooks's sufficiency challenge, the OCCA concluded, "Taken in the light most favorable to the prevailing party, a rational trier of fact could have found that Hooks provided insufficient evidence to show he was mentally retarded."  *Hooks Atkins Appeal*, 126 P.3d at 641.  That is precisely what *Jackson* requires in order to uphold the jury's determination in this context.  *See Maynard*, 468 F.3d at 674.  Accordingly, the OCCA's decision was not "contrary to" clearly established federal law.  *Cone*, 535 U.S. at 694 (quoting 28 U.S.C. § 2254(d)(1)).

"Because the OCCA applied the correct legal standard, our inquiry is limited to whether its determination that the evidence was sufficient to support the jury's verdict was reasonable."  *Young*, 486 F.3d at 667.  As noted, that inquiry also requires us to consider whether the OCCA, in upholding the jury's verdict, reasonably applied *Atkins* to Mr. Hooks's claim of mental retardation.

**3.**

The parties agree that Mr. Hooks meets the second prong of *Murphy*'s standard for mental retardation (that the deficiencies manifested themselves before the age of eighteen).  *See Hooks Atkins Appeal*, 126 P.3d at 641.  The dispute before the jury, before the OCCA, and before us centers on whether Mr. Hooks meets the first and third prongs of the *Murphy* test: *viz.*, sub-average intellectual ability, and significant limitations in adaptive functioning.

**a. Sub-average intellectual ability**

Under *Murphy*, a capital defendant's IQ score is used both to establish eligibility for a mental-retardation determination and as evidence to support a finding of sub-average intellectual ability. *Hooks Atkins Appeal*, 126 P.3d at 640. An IQ score of 70 or below meets the threshold requirement. *See id.* It is also strong evidence of sub-average intelligence. *See Atkins*, 536 U.S. at 309 n.5 ("[A]n IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."); *id.* at 316 (suggesting that "a national consensus has developed against" the execution of "offenders possessing a known IQ less than 70"); *Murphy*, 54 P.3d at 568 ("Intelligence quotients are one of the many factors that may be considered, but are not alone determinative.").

Mr. Hooks has been subjected to IQ testing throughout his life, and the *Atkins* jury was presented with nine of his IQ scores. These scores were obtained from tests administered over a thirty-four-year period, between 1970 and 2004, and they ranged from 53 to 80.[7] On direct appeal of the jury verdict, the OCCA concluded:

---

[7] The nine IQ scores presented to the jury and the OCCA on appeal were as follows (identified by year, the type of IQ test, and the score): 1970 SB score of 80, 1972 WISC score of 70, 1978 WAIS score of 61, 1979 WAIS score of 57, 1982 BETA-II score of 61, 1988 WAIS score of 80, 1994 WAIS-R score of 72, 2002 K-BIT score of 76, and 2004 WAIS-III score of 53.

Mr. Hooks also points us to a WAIS-III score of 67, obtained in testing in 2006. However, because this evidence was not before the OCCA on direct appeal, we are barred from considering it. *See Pinholster*, 131 S. Ct. at 1398; 28 U.S.C. § 2254(d)(2). The

(continued...)

The experts agreed this range of scores put Hooks in a "gray area". The tests of 70 and below all reflected some degree of lack of cooperation on Hooks's part, from variable attention span to refusal to respond. Two of them were obtained after Hooks suffered the trauma of an accident and his father's death, which could have caused him to test lower than his actual intellectual level. The expert witnesses agreed that the most reliable scores were those obtained by Dr. Gelbort and Dr. Cowardin, with results of 72 and 76. Neither of these scores meets the "seventy or below" requirement in *Murphy*, although Dr. Gelbort's results are within that range using the standard error of measurement (a five-point range on either side). Given the other testimony, it was not unreasonable for jurors to determine that the most reliable IQ evidence offered did not fall within the first prong of the *Murphy* definition, functioning at a significantly sub-average intellectual level. A rational trier of fact could have found that Hooks failed to meet this burden by a preponderance of the evidence.

*Hooks Atkins Appeal*, 126 P.3d at 640–41 (footnote omitted).

Mr. Hooks assails this conclusion in two ways. First, he contends that four of his IQ scores (scores of 80, 80, 61 and 76) "are of limited value and lack reliability." Aplt. Opening Br. at 25. We shall call this group of scores the "First Group." Second, after tossing out the above four scores, Mr. Hooks contends that the remaining five (scores of 70, 61, 57, 72, and 53[8])—what we shall call the "Second Group"—must be adjusted downward for a statistical phenomenon known as the Flynn Effect. After adjustment, the

---

[7](...continued)
OCCA did consider the 2006 score in collateral proceedings, but only in the context of Mr. Hooks's claim of ineffective assistance of counsel at the *Atkins* trial. *See Hooks Atkins Collateral*, slip op. at 8–9. (Specifically, Mr. Hooks claimed that *Atkins* counsel was ineffective for failing to obtain a more updated score.) However, the 2006 score cannot enter into our calculus in assessing the OCCA's decision to uphold the jury verdict.

[8]      As noted, Mr. Hooks also points to the additional IQ score of 67 obtained in 2006, but we do not consider it. *See supra* note 7.

five scores become 63, 54, 50, 67, and 50, respectively—all well below *Murphy*'s threshold of 70. On this view of the evidence, Mr. Hooks argues that the OCCA's finding that he is in a "gray area" was unreasonable.

We note that the First Group includes the K-BIT score of 76 and the Second Group includes the WAIS-R score of 72, both obtained by Mr. Hooks's own experts (Dr. Nancy Cowardin and Dr. Michael Gelbort, respectively) and deemed by the OCCA, based on the opinions of experts from both sides, to be the "most reliable" of all the IQ scores. *Hooks Atkins Appeal*, 126 P.3d at 640. Mr. Hooks does not contest that conclusion. With respect to the K-BIT score, he contends only that "caution" must be used in interpreting the score because Dr. Cowardin's test was "not meant to substitute for a comprehensive intelligence test." Aplt. Opening Br. at 26. But Dr. Cowardin was Mr. Hooks's own expert, and her testing formed the basis for her conclusion that Mr. Hooks is mildly mentally retarded. *See* 4 M.R. at 116.[9] Mr. Hooks's other expert, Dr. Gelbort, relied on Dr. Cowardin's report and his own evaluation to opine that Mr. Hooks is mildly mentally retarded, *see* 3 M.R. Tr. at 112–13, although even he admitted that Mr. Hooks fell into a "gray area," *id.* at 95. Finally, the State's expert, Dr. Terese Hall, thought the evaluations by Drs. Cowardin and Gelbort were "the best testing we have." *See* 5 M.R. Tr. at 42. The OCCA found that many of the other scores, particularly those on the low end, posed reliability problems. That finding is presumed correct, and in any event, our independent

---

[9]     Throughout this opinion, we employ the abbreviation "[volume number] M.R. Tr." to refer to a particular volume of the six-volume transcript of the *Atkins* trial.

review of the record confirms it. *See* 3 M.R. at 23, 44, 47–49 (Test. of Dr. Beck); *id.* at 86–88, 94–95, 174–75 (Test. of Dr. Gelbort); 4 M.R. at 111–12 (Test. of Dr. Cowardin); 5 M.R. at 19–20, 38–41 (Test. of Dr. Hall). Accordingly, it was not unreasonable for the OCCA to find the K-BIT and WAIS-R scores the "most reliable" and to accord them greater weight.

Mr. Hooks asserts that the Second Group of scores, including the WAIS-R score of 72, must be downwardly adjusted for the Flynn Effect. The Flynn Effect is a phenomenon named for James R. Flynn, who discovered that the population's mean IQ score rises over time, by approximately 0.3 points per year. Under his theory, if an individual's test score is measured against a mean of a population sample from prior years, then his score will be inflated in varying degrees (depending on how long ago the sample was first employed) and will not provide an accurate picture of his IQ. *See, e.g.*, *Walton v. Johnson*, 440 F.3d 160, 177 n.22 (4th Cir. 2006) (en banc) ("The premise of the 'Flynn Effect' is that IQ scores increase over time and that IQ tests that are not renormed to take into account rising IQ levels will overstate a testtaker's IQ score."); James. R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 Psychol. Pub. Pol'y & L. 170, 172 (2006) [hereinafter Flynn, *Tethering the Elephant*] ("Naturally, judges want to know whether defendants were actually two standard deviations below their peers at the time they were tested and *not* how they rank against a group selected at some random date in the past." (emphasis added)). *See generally* James R. Flynn, *The Mean IQ of Americans: Massive Gains 1932 to 1978*, 95 Psychol. Bull. 29 (1984). Flynn

posited that a downward adjustment to scores is necessary when a test without current norms is used. *See* Flynn, *Tethering the Elephant*, *supra*, at 174–75.

However, neither *Murphy* nor its progeny requires an adjustment for the Flynn Effect, *see Murphy*, 54 P.3d at 567–68; *see also Smith*, 245 P.3d at 1237 n.6 ("[U]nder the Oklahoma statutory scheme, the Flynn Effect, whatever its validity, is not a relevant consideration in the mental retardation determination for capital defendants."), and the OCCA did not address its relevance on direct appeal. It mentioned it briefly on collateral review, stating that "some experts noted Hooks's reliable score of 72 could have been slightly inflated [due to the Flynn Effect]." *Hooks Atkins Collateral*, slip op. at 8–9. The only Flynn Effect evidence presented to the *Atkins* jury came from the testimony of Dr. Gelbort, who noted that the Flynn Effect is a "well-researched and published" phenomenon, 3 M.R. Tr. at 159, and suggested that "people who talk about the Flynn Effect would argue" that certain of Mr. Hooks's IQ scores are "a little higher than [they] ought to be," *id.* at 219–22, due to the non-current population samples that were used to normalize (i.e., derive a population mean for) his scores. Mr. Hooks argues that the OCCA's failure to account for and apply the Flynn Effect was "contrary to *Atkins* because it fails to deal with the real [IQ] scores." Aplt. Reply Br. at 7.

The OCCA's failure to account for and apply the Flynn Effect was not "contrary to" or "an unreasonable application of" clearly established federal law, 28 U.S.C. § 2254(d)(1), because the threshold requirement—the existence of clearly established federal law—is not met here. *See House*, 527 F.3d at 1015. *Atkins* does not mandate an

adjustment for the Flynn Effect.  Moreover, there is no scientific consensus on its

validity.  *See Thomas v. Allen*, 607 F.3d 749, 757 (11th Cir. 2010) ("[T]he Flynn effect is

a statistically-proven phenomenon, although no medical association recognizes its

validity."); Frank M. Gresham & Daniel J. Reschly, *Standard of Practice and Flynn*

*Effect Testimony in Death Penalty Cases*, 49 Intell. & Developmental Disabilities 131,

131, 136–37 (2011) (arguing that the Flynn Effect is "a well-established psychometric

fact" that should be accounted for in IQ testing, but noting the lack of a consensus in the

clinical community on its use).  In addition, federal and state courts are divided over the

use of the Flynn Effect, and "there is no uniform consensus regarding the application of

the Flynn effect in determining a capital offender's intellectual functioning."  *Thomas*,

607 F.3d at 757–58 (collecting cases); *see also Maldonado v. Thaler*, 625 F.3d 229, 238

(5th Cir. 2010) ("[N]either this court nor the [Texas Court of Criminal Appeals] has

recognized the Flynn Effect as scientifically valid.").

Even if this Circuit were prepared to take a side in this debate and hold that, under

*Atkins*, the Flynn Effect must be considered in determining whether a defendant is

mentally retarded, we could not do so on habeas review.  "No decision of th[e Supreme]

Court . . . squarely addresses the issue . . . ."  *Wright v. Van Patten*, 552 U.S. 120, 125

(2008) (per curiam).  "Because [the Court's] cases give no clear answer to the question

presented, let alone one in [Mr. Hooks's] favor," *id.* at 126, it cannot be said that the

OCCA's failure to consider and apply the Flynn Effect is contrary to, or an unreasonable

application of, clearly established federal law.

We are left, then, with a number of IQ scores, some below and some above a score of 70.  We do not believe this set of scores unquestionably qualifies Mr. Hooks as significantly sub-average in intellect.  Given the reliability problems associated with many of the scores and the strong reliability of the scores of 72 and 76 from Mr. Hooks's own experts, we agree that Mr. Hooks falls into a "gray area."  *Hooks Atkins Appeal*, 126 P.3d at 640 (internal quotation marks omitted); *see also Atkins*, 536 U.S. at 309 n.5 ("[A]n IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.").  A rational trier of fact could conclude from this evidence that Mr. Hooks indeed functions at a sub-average intellectual level, but it could also rationally draw the conclusion that he does not.  *Cf. Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").  Accordingly, it was not an unreasonable application of *Jackson* for the OCCA to find that Mr. Hooks's evidentiary burden was not met and to uphold the jury verdict.

### b. Functional limitations

As an alternative basis for its holding, the OCCA also rejected Mr. Hooks's sufficiency-of-the-evidence challenge under the third prong of *Murphy*, which required Mr. Hooks to show that he has "significant limitations in adaptive functioning in at least two of [nine] skill areas."  *Murphy*, 54 P.3d at 567–68.  After a summary of the evidence both for and against Mr. Hooks, the OCCA concluded that "a rational trier of fact could

-26-

have determined that this evidence did not show significant deficits in adaptive functioning" and that Mr. Hooks had "failed to meet his burden on this issue." *Hooks Atkins Appeal*, 126 P.3d at 641.

Mr. Hooks argues that he satisfied *Murphy*'s third prong because of his deficiencies in two skills areas (communication and academics), and he assails the OCCA's conclusion on two grounds. First, he faults the OCCA for focusing on his strengths rather than his limitations, which he contends was contrary to *Atkins*. Second and relatedly, he argues that a proper focus on his limitations, to the exclusion of his strengths, puts the existence of his mental retardation beyond dispute. We reject both arguments. Requiring the OCCA to focus only on Mr. Hooks's limitations and to ignore his strengths is not clearly established federal law, and based on the evidence (limitations *and* strengths), a rational trier of fact could conclude that Mr. Hooks failed to satisfy the third prong of *Murphy* by a preponderance of the evidence.[10]

Mr. Hooks first argues that the OCCA's focus on his strengths rather than his limitations was objectively unreasonable because it is contrary to the "holistic approach" recommended by the AAIDD, which "focuses on the individual's limitations." Aplt. Opening Br. at 44 (quoting AAIDD, *Intellectual Disability: Definition, Classification,*

---

[10]    Some of the evidence that Mr. Hooks highlights in his opening brief was not before the OCCA. This includes statements by Pat Prater, a counselor at Oklahoma State Penitentiary; statements by Walanzo Robinson and Paris Powell, fellow prisoners of Mr. Hooks; and the supplemental report of Dr. Cowardin. *See* Aplt. Opening Br. at 35–37, 41–42. We are barred from considering this evidence. *See Pinholster*, 131 S. Ct. at 1398; 28 U.S.C. § 2254(d)(2).

*and Systems of Supports* 94 (11th ed. 2010)) (internal quotation marks omitted).  He

continues: "When the *Atkins*[] Court determined there was a national consensus that

offenders meeting the clinical definition of mentally retarded could not be executed, it

essentially adopted the clinical definition of the condition.  Further, the focus is on

deficits, not strengths, as clearly established within the clinical community and by

*Atkins*."  Aplt. Reply Br. at 10.  We are not persuaded.

While *Atkins* is undoubtedly clearly established federal law, the precise contours of

the definition of mental retardation are not. "The Supreme Court specifically left to the

various states 'the task of developing appropriate ways to enforce the constitutional

restriction' on the execution of mentally retarded criminals."  *Ochoa*, 669 F.3d at 1133

n.1 (quoting *Atkins*, 536 U.S. at 317).  Nothing in *Atkins* (or Oklahoma law for that

matter) requires the OCCA to ignore a defendant's strengths in determining whether *in

fact* he exhibits significant functional limitations in certain skill areas.

Mr. Hooks bases his argument to the contrary on language in the *Atkins* opinion

such as the following: "[C]linical definitions of mental retardation require . . . significant

*limitations* in adaptive skills."  *Atkins*, 536 U.S. at 318 (emphasis added); *see* Aplt. Reply

Br. at 10.  This argument is unavailing.  *Murphy*, too, requires a defendant to show

"significant *limitations* in adaptive functioning."  54 P.3d at 567 (emphasis added).  But

this is a legal standard, and whether it is satisfied depends upon the facts: What is a given

defendant able and unable to do?  Both strengths and deficiencies enter into this equation

because they make up the universe of facts tending to establish that a defendant either has

"significant limitations" or does not. Not only does *Murphy* not require the OCCA to focus on deficiencies to the exclusion of strengths but—most relevant to our inquiry here—neither does *Atkins*.

Furthermore, even if the AAIDD's "holistic approach" requires a clinician to ignore functional strengths, as Mr. Hooks contends, the clinical standard is not a constitutional command. Section 2254(d)(1) refers to "clearly established Federal law, as determined by the Supreme Court of the United States," and as we have explained, "Supreme Court holdings" are "the exclusive touchstone for clearly established federal law." *House*, 527 F.3d at 1015. The Supreme Court in *Atkins* could have adopted the clinical standard, but explicitly declined to do so. *See Atkins*, 536 U.S. at 317; *Ochoa*, 669 F.3d at 1133 n.1. We therefore conclude that the OCCA's consideration of evidence of Mr. Hooks's strengths was not "contrary to" or "an unreasonable application of" *Atkins*. 28 U.S.C. § 2254(d)(1).

That being so, Mr. Hooks's second contention must fail. Having argued that evidence of his strengths should not be considered to support the *Atkins* jury's conclusion, he selectively highlights those portions of the trial record that support his limitations in adaptive functioning. *See* Aplt. Opening Br. at 32–35, 39–41. But this was not the only evidence before the jury. For example:

- Some experts found that Mr. Hooks communicated well and could express his thoughts and feelings clearly. 5 M.R. Tr. at 32–33, 55 (Test. of Dr. Hall).

- Mr. Hooks read the Bible, 4 M.R. Tr. at 210 (Test. of Shanna Dinh); read

other books in prison, *id.* at 125–26 (Test. of Dr. Cowardin); and could use a dictionary, *id.* at 125.

- Mr. Hooks wrote a number of letters in which he communicated his feelings forcefully and clearly. *Id.* at 126–32; *see* State's Exs. 1–6 to M.R.[11]

- Mr. Hooks communicated with multiple landlords and filled out rental applications. 4 M.R. Tr. at 205 (Test. of Ms. Dinh); 5 M.R. Tr. at 31 (Test. of Dr. Hall); 5 M.R. Tr. at 167 (Test. of Eric Mullenix). He also negotiated with a car salesman to obtain the price he wanted on a vehicle. 4 M.R. Tr. at 206–07 (Test. of Ms. Dinh).

- Mr. Hooks lived independently and traveled to see his mother often. 2 M.R. Tr. at 184–85 (Test. of Clara Hooks); 5 M.R. Tr. at 30 (Test. of Dr. Hall); 5 M.R. Tr. at 169 (Test. of Mr. Mullenix). He talked about running errands, shopping, and having a loose muffler repaired. 5 M.R. Tr. at 167 (Test. of Mr. Mullenix).

- Mr. Hooks managed his money "just fine" and paid his bills. *Id.* at 31 (Test. of Dr. Hall). He frequently pawned items or sold food stamps to earn cash for groceries and items for his child. *Id.*; 4 M.R. Tr. at 211 (Test. of Ms. Dinh); 5 M.R. Tr. at 168 (Test. of Mr. Mullenix).

---

[11]      There is a dispute over whether Mr. Hooks had help writing these letters. None of the letters mentioned that Mr. Hooks had received help until after the evidentiary hearing on his *Atkins* claim, where Dr. Gelbort testified that the relevance of the letters to the question of mental retardation depended on whether Mr. Hooks wrote them himself. Following Dr. Gelbort's testimony, Mr. Hooks's next letter stated, "I'm having some help write [sic] this letter." State's Ex. 6 to M.R. There are two possible interpretations of this evidence. Under one interpretation, Mr. Hooks had in fact received writing assistance all along, and when it became apparent at the evidentiary hearing that this assistance was relevant, he or the individual helping him wanted to clarify that fact. Under a second interpretation, Mr. Hooks had never received writing assistance, but upon discovering that his writing abilities might hurt his case for mental retardation, he attempted to portray himself as less capable. The latter interpretation is what the State argued to the jury. *See* 3. M.R. Tr. at 195–96 (cross-examination of Dr. Gelbort). Before us, Mr. Hooks argues that he had help writing the letters and points to evidence that was not before the OCCA. Limiting our review, as we must, to the record in the state-court proceedings, and in light of two plausible interpretations of the evidence, a rational trier of fact could have doubted Mr. Hooks's claim to have received assistance.

- Mr. Hooks ran a prostitution ring, rented apartments for prostitutes, paid their rent, and collected money from them. 4 M.R. Tr. at 198–205 (Test. of Ms. Dinh).

The evidence concerning Mr. Hooks's behavioral limitations was controverted, and resolving the limitations question "depended heavily on the factfinders' appraisal of witness credibility and demeanor." *Bryan v. Gibson*, 276 F.3d 1163, 1172 (10th Cir. 2001) (quoting *Thompson v. Keohane*, 516 U.S. 99, 111 (1995)) (internal quotation marks omitted), *vacated in part on other grounds sub nom. Bryan v. Mullin*, 335 F.3d 1207, 1211 (10th Cir. 2003) (en banc). A rational trier of fact could have found that Mr. Hooks failed to establish, by a preponderance of the evidence, that he has significant adaptive limitations, and accordingly, the OCCA's decision to uphold the jury verdict was not an unreasonable application of *Jackson*.[12]

---

[12] Before the district court, Mr. Hooks argued that he has adaptive behavioral limitations in four skill areas: communication, academics, health and safety, and self-direction. *See Hooks Habeas II*, 693 F. Supp. 2d at 1295. His opening brief to this court makes no argument concerning health and safety and self-direction, *see* Aplt. Opening Br. at 32 ("[T]he deficiency is so clear in two skill areas of communication and academics, Petitioner will focus on those two areas."), and his reply brief mentions health and safety and self-direction in only cursory fashion, *see* Aplt. Reply Br. at 12. Ordinarily we would consider any argument concerning limitations in health and safety and self-direction to be abandoned. *See Fairchild v. Workman*, 579 F.3d 1134, 1146 (10th Cir. 2009) (finding that the State "forfeited" an argument because it had "effectively abandoned the argument by failing to make it in its appellate brief"); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

If we were to entertain the argument, however, it would not warrant a different result. As with communication and academics, a rational trier of fact could conclude, based on the record before it, that Mr. Hooks did not have significant limitations in health

(continued...)

-31-

## C. Fairness of the *Atkins* Trial

Mr. Hooks's second claimed ground for habeas relief implicates the fundamental fairness of his *Atkins* trial. He asserts that a number of errors during trial violated his Fifth, Sixth, and Fourteenth Amendment rights. He puts forward the following six claims: (1) a potential juror was improperly removed for cause; (2) the trial court improperly prohibited cross-examination of Shanna Dinh, one of the State's witnesses; (3) the State committed a *Brady* violation; (4) the trial court committed two state-law evidentiary errors that denied him due process; (5) his attorney at the *Atkins* trial was ineffective; and (6) the cumulative effect of these errors resulted in an unfair trial.

Some of these claims were adjudicated on the merits by the OCCA, and some were not. We address the appropriate standard of review in the context of each claim. We ultimately reject all six claims and conclude that Mr. Hooks is not entitled to relief on these grounds.

Before proceeding, we pause to note that each of these claims is properly an "*Atkins* claim" subject to federal habeas review under 28 U.S.C. § 2254. *See Ochoa*, 669

---

(...continued)
and safety and self-direction. In that regard, as our discussion of the record reveals, there was evidence that Mr. Hooks lived independently, traveled to see his mother often, managed his money and paid his bills, accepted the responsibility of caring for his wife and child, pawned items for cash, and managed a prostitution ring. In addition, Mr. Hooks required the apartments he rented for prostitutes to be clean, 4 M.R. Tr. at 204 (Test. of Ms. Dinh), and his mother described him as a "neat person" who kept his clothes and own house clean, 2 M.R. Tr. at 214–16 (Test. of Clara Hooks). There was also evidence that Mr. Hooks had worked as a laborer. 2 M.R. Tr. at 152 (Test. of Virginia Betts); *id.* at 182 (Test. of Clara Hooks); 3 M.R. Tr. at 168 (Test. of Dr. Gelbort); State's Ex. 8 to M.R. at 15 (E. State Hosp. Med. Record Summ., dated 1982).

F.3d at 1143. It is true that *Atkins* does not provide "definitive procedural or substantive guid[ance]" on how state courts should or must adjudicate *Atkins* claims. *Bobby v. Bies*, 556 U.S. 825, 831 (2009) (quoting *Atkins*, 536 U.S. at 317). But the Supreme Court has also indicated "that state court 'measures for adjudicating claims of mental retardation . . . might, in their application, be subject to constitutional challenge.'" *Ochoa*, 669 F.3d at 1142 (quoting *Schriro v. Smith*, 546 U.S. 6, 7 (2005)). In our recent decision in *Ochoa*, we held that the Fourteenth Amendment's due-process protections are applicable in an *Atkins* proceeding because "Oklahoma adopted the jury trial, with its historically attendant procedural protections, as the method to vindicate" the right of the mentally retarded to avoid execution. *Id.* at 1143. On that basis, we proceed to an examination of Mr. Hooks's claims.

### 1. Removal of Venire Member for Cause

Mr. Hooks asserts error based on the trial court's removal for cause of a potential juror, Donna Paddock. Ms. Paddock was familiar with the clinical definition of mental retardation and suggested that if the clinical definition conflicted with the legal one, she might be unable to apply the latter impartially. *See* 1 M.R. Tr. at 105, 124, 159–63. The trial court granted the State's motion and excluded her for cause. *Id.* at 167.

On appeal, the OCCA denied Mr. Hooks's claim of error, citing the Supreme Court's decision in *Wainwright v. Witt*, 469 U.S. 412 (1985), and stating, "The decision to excuse a juror for cause is within the trial court's discretion. A juror must agree to follow the law; any other response would prevent or substantially impair performance of her

-33-

duties in accordance with her instructions and oath." *Hooks Atkins Appeal*, 126 P.3d at 645 (footnote omitted). The OCCA noted that there was "little likelihood of conflict" between the clinical and legal definitions of mental retardation, but that "the issue" was Ms. Paddock's duty to "follow the law, whatever it was," which "[s]he could not do." *Id.* It concluded that "[t]he trial court did not abuse its discretion in excusing her for cause." *Id.*

Mr. Hooks claims that the OCCA's decision was an unreasonable application of *Witt* because Ms. Paddock's views would not have prevented or substantially impaired her performance as a juror. The State counters that *Witt* is not clearly established federal law because "the Supreme Court has not extended [*Witt*] to mental retardation proceedings," Aplee. Br. at 35, and that, in any event, the OCCA's application of *Witt* was not unreasonable.

At the outset, in the unique setting of an *Atkins* proceeding, we reject the State's suggestion that *Witt* is not clearly established federal law solely because the Supreme Court has not expressly "extended" it to such proceedings. We find this argument to be unpersuasive under the rationale of our decision in *Ochoa* and, indeed, conclude that it is foreclosed by that precedent. *See* 669 F.3d at 1143. We do hold, however, that *Witt* cannot be read to extend to the unique "*factual* context," *House*, 527 F.3d at 1016 (emphasis added), of Mr. Hooks's claim, and for that reason, there is no clearly established federal law that allows us to evaluate the claim.

In *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968), the Supreme Court held that

-34-

venire members in a capital case may not be excused for cause "simply because they voice[] general objections to the death penalty." Such exclusion violates a capital defendant's Sixth and Fourteenth Amendment right to an impartial jury, for it empanels "a jury uncommonly willing to condemn a man to die." *Id.* at 521. In *Witt*, the Court, building upon *Witherspoon*, set forth "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment." 469 U.S. at 424. "That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). In *Gray v. Mississippi*, 481 U.S. 648, 668 (1987), the Court affirmed these principles, holding that the erroneous "*Witherspoon* exclusion" of a qualified juror in a capital case entitles the defendant to automatic reversal of his sentence.

Important as it is, the *Witherspoon-Witt* rule is a narrow one. First, it does not apply outside the context of capital sentencing. *See Lockhart v. McCree*, 476 U.S. 162, 183 (1986) ("We reject [the] suggestion that *Witherspoon* and *Adams* have broad applicability outside the special context of capital sentencing . . . ."); *United States v. Prince*, 647 F.3d 1257, 1264 (10th Cir. 2011) ("The Court has never extended this doctrine beyond the death penalty context."). Second, and more importantly for present purposes, the Supreme Court has never applied the rule to the removal of a venire member for reasons *other than* the member's "views on capital punishment." *Witt*, 469 U.S. at 424; *cf. Ross v. Oklahoma*, 487 U.S. 81, 87–88 (1988) ("We decline to extend the

rule of *Gray* beyond its context: the erroneous '*Witherspoon* exclusion' of a qualified juror in a capital case. We think the broad language used by the *Gray* Court is too sweeping to be applied literally, and is best understood in the context of the facts there involved." (footnote omitted)). Thus, as our sister circuits have recognized, apart from "questions of death penalty scruples," exclusion of a particular venire member does not ordinarily entitle a defendant to relief because "[a] defendant has no constitutional or other right to the service of a particular juror." *United States v. Joseph*, 892 F.2d 118, 124 (D.C. Cir. 1989); *see Jones v. Dretke*, 375 F.3d 352, 355 (5th Cir. 2004). Where a potential juror is excused for reasons other than her views on the death penalty, even an erroneous exclusion is not constitutional error "so long as the jury that sits is impartial." *Jones*, 375 F.3d at 355 (quoting *United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000)) (internal quotation marks omitted); *see also United States v. Perez*, 387 F.3d 201, 208 (2d Cir. 2004) ("Not every error during *voir dire* compels a new trial, and outside of the limited realm that *Gray* carved out for capital sentencing, the inquiry we ordinarily engage in asks whether an error of exclusion resulted in prejudice to the defendant. Since appellant does not contest that the jury *ultimately impaneled* was fair and impartial, his allegation of error does not implicate his constitutional right to a fair trial."); *United States v. Brooks*, 175 F.3d 605, 606 (8th Cir. 1999); *United States v. Padilla-Mendoza*, 157 F.3d 730, 734 (9th Cir. 1998).

In light of the foregoing, we hold that there is no clearly established federal law entitling Mr. Hooks to relief. The *Witherspoon-Witt* rule applies only in the capital-

sentencing context, and only when a venire member is erroneously removed for cause "because of his or her views on capital punishment." *Witt*, 469 U.S. at 424. Here, the venire member, Ms. Paddock, was excused not "because of . . . her views on capital punishment," *id.*, but because she professed an apparent inability to set aside her clinical training and adhere to the legal definition of mental retardation. This is not the fact pattern implicated by *Witherspoon-Witt*. Accordingly, Mr. Hooks's impartial-jury claim must focus "on the jurors who ultimately sat." *Ross*, 487 U.S. at 86. However, since he "does not contest that the jury *ultimately impaneled* was fair and impartial, his allegation of error does not implicate his constitutional right to a fair trial." *Perez*, 387 F.3d at 208. The claim thus fails at the threshold for lack of clearly established federal law, and we need not evaluate the OCCA's resolution of it. *See House*, 527 F.3d at 1018 ("The absence of clearly established federal law is dispositive under § 2254(d)(1).").

## 2. Cross-Examination of Shanna Dinh

At the *Atkins* trial, Shanna Dinh, a witness for the State and a former friend of Mr. Hooks, testified at length about Mr. Hooks's daily routine, numerous girlfriends, running of a prostitution ring, negotiation with landlords and a car salesman, and meticulous cleaning habits, among other things. *See* 4 M.R. Tr. at 194–215. On cross-examination, counsel sought to impeach Ms. Dinh's credibility with prior inconsistent statements, including statements she made at Mr. Hooks's original trial in 1989. The most notable inconsistency concerned Ms. Dinh's living arrangements. She claimed at the 1989 trial to have lived with Mr. Hooks "for a couple of months," 2 Trial Tr. at 413 (Test. of Ms.

-37-

Dinh),[13] but claimed at the 2004 *Atkins* trial to have lived with him for years, *see* 4 M.R. Tr. at 197–98. Mr. Hooks avers that the trial court "prohibited *all* inquiry" into this and other alleged inconsistencies,[14] thereby denying him his right to confrontation under the Sixth and Fourteenth Amendments. Aplt. Opening Br. at 53.[15]

"The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). "Confrontation means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Central to the Clause's purpose is "secur[ing] for the opponent the opportunity of cross-examination." *Van Arsdall*, 475 U.S. at 678 (emphasis omitted) (quoting *Davis*, 415 U.S. at 315–16) (internal quotation marks omitted). The right of confrontation through cross-examination is not absolute, however. "[T]rial judges retain wide latitude

---

[13]     Throughout this opinion, we employ the abbreviation "[volume number] Trial Tr." to refer to a particular volume of the three-volume transcript of the original trial.

[14]     Mr. Hooks also points us to allegedly inconsistent statements by Ms. Dinh concerning whether Ms. Blaine worked for Mr. Hooks as a prostitute. Our independent review of the record reveals no inconsistency in this regard, so we do not address it further. *Compare* 2 Trial Tr. at 415–16 (Test. of Ms. Dinh) (stating that Mr. Hooks tried to persuade Ms. Blaine to work as a prostitute for him but "[s]he wouldn't"), *with* 4 M.R. Tr. at 222 (Test. of Ms. Dinh) (stating that Ms. Blaine engaged in prostitution "once and she didn't like it and whenever [Mr. Hooks] tried to make her do it again[,] she didn't do it").

[15]     To the extent that Mr. Hooks asks us to consider evidence not before the OCCA, we are precluded from doing so. *See Pinholster*, 131 S. Ct. at 1398; 28 U.S.C. § 2254(d)(2).

insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 679. And "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

The OCCA rejected Mr. Hooks's Confrontation Clause claim, resting its conclusion on the ground that, while Ms. Dinh may not have truthfully testified about her living arrangements, "[Mr.] Hooks offers no evidence to suggest that [Ms. Dinh's] testimony regarding her observations during the time she did spend with him were inaccurate." *Hooks Atkins Appeal*, 126 P.3d at 643. In light of our ultimate disposition of this challenge, it suffices for us to assume without deciding that the Supreme Court's Confrontation Clause jurisprudence is clearly established law in the *Atkins* context. *Cf. Wilson v. Sirmons*, 536 F.3d 1064, 1111 (10th Cir. 2008) ("[W]e have recently stated that it is far from clear whether the Confrontation Clause even applies at capital sentencing proceedings." (quoting *United States v. Barrett*, 496 F.3d 1079, 1099 (10th Cir. 2007)) (internal quotation marks omitted)), *rehr'g granted on other grounds*, 549 F.3d 1267 (10th Cir. 2008). Operating on that assumption, we nonetheless hold that the OCCA's ruling was an erroneous and unreasonable application of the Supreme Court's Confrontation Clause precedents.

As the Court explained in *Davis*,

> Cross-examination is the principal means by which the *believability* of a witness *and* the *truth of his testimony* are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness'[s] story to test the witness'[s] perceptions and memory, but *the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness*.

415 U.S. at 316 (emphases added). Mr. Hooks sought to impeach Ms. Dinh for this very purpose—not to impugn the accuracy of her specific observations of his behavior, but to discredit her *generally* and highlight her capacity for untruthfulness. The OCCA rejected Mr. Hooks's claim because his impeachment evidence did not counter the accuracy of specific observations made by Ms. Dinh. That ruling, however, reflects an incomplete understanding of the Confrontation Clause's protective sweep. The Clause secures far more than the right to challenge the accuracy of specific aspects of a witness's testimony. It entitles a defendant to "confront" the witness, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Kentucky v. Stincer*, 482 U.S. 730, 738 (1987) (omission in original) (quoting *Davis*, 415 U.S. at 318) (internal quotation marks omitted). The OCCA's rationale for rejecting Mr. Hooks's Confrontation Clause claim was an unreasonable application of the Supreme Court's precedents.

Because the OCCA unreasonably applied (what we have assumed to be) clearly established federal law, AEDPA deference does not apply. *See Spears v. Mullin*, 343 F.3d 1215, 1248 (10th Cir. 2003). "That, however, is not the end of our inquiry. We

-40-

must determine *de novo* if a violation of the Confrontation Clause occurred." *Brown v. Uphoff*, 381 F.3d 1219, 1225 (10th Cir. 2004). We conclude that Mr. Hooks's Confrontation Clause claim is without merit.

First, Mr. Hooks's contention that the trial court "prohibited *all* inquiry into Ms. Dinh's inconsistent statements," Aplt. Opening Br. at 53, is simply inaccurate. On cross-examination, counsel was permitted to ask Ms. Dinh how long she had lived in foster care during the period of time she claimed to be living with Mr. Hooks. *See* 4 M.R. Tr. at 217–18, 220–21. Second, while the trial court did sustain several objections on grounds of relevancy, exceeding the scope of direct, and hearsay, it permitted counsel to rephrase her questions or ask questions more relevant to the jury's assessment of Ms. Dinh's credibility. *See id.* at 215–24. Finally, although Ms. Dinh's testimony at the *Atkins* trial concerning how long she had lived with Mr. Hooks was indeed wildly inconsistent with her testimony in 1989, counsel never actually attempted to cross-examine Ms. Dinh concerning this precise issue, much less to drill down and explore it in detail.[16] Based on our independent review of the record, we find that the trial court's control of the cross-examination process—allowing for some impeachment and narrowing the scope of the questioning—fell well within its broad discretion to "impose reasonable limits" on the

---

[16] At one point, counsel asked Ms. Dinh to confirm her testimony suggesting that she had lived with Mr. Hooks "90 percent of the time" between 1984 and 1987. 4 M.R. Tr. at 217. When Ms. Dinh confirmed, counsel followed up by asking, "[W]ere you living with Mr. Hooks at the time you were in foster care?" *Id.* Ms. Dinh responded, "No, I was in foster care." *Id.* Counsel then proceeded to a question about whether Ms. Dinh had gotten married in 1988. *See id.*

process.  *Van Arsdall*, 475 U.S. at 679.  We therefore reject Mr. Hooks's Confrontation Clause claim.

### 3. Alleged *Brady* Violation

On June 14, 2004, after the *Atkins* trial began, state prosecutor Pattye High gave counsel for Mr. Hooks, Vicki Werneke, a memorandum detailing a phone conversation between Ms. High and Pat Prater.  At the time, Ms. Prater was an employee of the Oklahoma Department of Corrections and Mr. Hooks's case manager and counselor.  The memorandum stated:

> When I asked [Ms. Prater] if she thought Victor Hooks was MR [mentally retarded], her response was, "I wouldn't be surprised, because he talks like one".  "You know how they talk?  He talks like that".  She could not give me any other detail, just that he "talks like one".  I just wanted to pass that along to you.  She no longer works in H-Unit [where Mr. Hooks is housed], but I got her on the phone by calling [redacted phone number] and asking for her.

R., Vol. 1, pt. 2 at 418 (Memo. from Pattye High to Vicki Werneke, dated June 14, 2004).

Mr. Hooks claims that a *Brady* violation occurred as a result of the circumstances under which the prosecution disclosed this memo.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).  In support, he cites an affidavit from George Rawlings, an investigator for the Federal Public Defender's office, recounting a conversation between him and Ms. Prater. *See* R., Vol. 1, pt. 2 at 416 (Aff. of George Rawlings, dated Jan. 4, 2005).  According to the affidavit, Ms. Prater recalled a "much more detailed" conversation than the one suggested in Ms. High's memo.  *Id.*  For example, Ms. Prater recalled telling Ms. High that she often had to explain things to Mr. Hooks several times, that Mr. Hooks frequently

-42-

gave her a "blank stare," and that "even though she was not a doctor . . . , she believes [Mr. Hooks] is mentally retarded" and "would not be surprised if testing would show he is mentally retarded." *Id.* (internal quotation marks omitted).

Mr. Hooks's *Brady* claim was not adjudicated on the merits by the OCCA. That court ruled that it was procedurally defaulted and barred from consideration in collateral proceedings because it was not timely presented. *Hooks Atkins Collateral*, slip op. at 4–5. The State contends that we should not consider the merits of the claim. The district court, noting the convoluted procedural history of this case, reached the merits, ultimately rejecting the claim. *See Hooks Habeas II*, 693 F. Supp. 2d at 1310–12. We follow the district court's lead and "invoke our discretion to bypass complex issues of exhaustion and procedural bar to reject the claim on the merits." *Revilla v. Gibson*, 283 F.3d 1203, 1211 (10th Cir. 2002) (citing § 2254(b)) (other citations omitted). Our review of the district court's decision is *de novo*. *Id.*

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "To establish a *Brady* violation, a defendant must demonstrate that '(1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense.'" *United States v. Wooten*, 377 F.3d 1134, 1142 (10th Cir. 2004) (quoting *Scott v. Mullin*, 303 F.3d 1222, 1230 (10th Cir. 2002)). This test is conjunctive, and failure to satisfy any of the prongs is dispositive. *See United*

-43-

*States v. Smith*, 534 F.3d 1211, 1223 (10th Cir. 2008). We reject Mr. Hooks's claim on the first prong because the State did not suppress evidence.

"Evidence is not suppressed within the meaning of *Brady* if it is made known and available to the defense prior to trial." *Wooten*, 377 F.3d at 1142. *Brady* "does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 823 (10th Cir. 1995); *see Moore v. Illinois*, 408 US. 786, 795 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."). Further, disclosure need not be "in a specific form or manner." *United States v. Hernandez-Muniz*, 170 F.3d 1007, 1011 (10th Cir. 1999).

We have no trouble concluding that the State fulfilled its *Brady* obligation here. Ms. High disclosed to Ms. Werneke that she had spoken with Ms. Prater and that Ms. Prater had opined that Mr. Hooks was mentally retarded. Evidence favorable to Mr. Hooks was thus "made known and available" to his counsel. *Wooten*, 377 F.3d at 1142. While Ms. High did not go into great detail about the conversation, she need not have. Not "every possible shred of evidence" need be disclosed, *Smith*, 50 F.3d at 823, nor is a "complete and detailed accounting" required, *Moore*, 408 U.S. at 795. The memo disclosed enough of the conversation with Ms. Prater to put counsel for Mr. Hooks on notice that favorable and possibly material evidence was available. Ms. High even left instructions on how to contact Ms. Prater. Finally, while Ms. Prater apparently recalled a

"much more detailed" conversation than the memo reveals, R., Vol. 1, pt. 2 at 416, her recounting of that conversation is not substantially different from Ms. High's. Ms. High's memo was an accurate, if abbreviated, summary of details concerning Ms. Prater's conversational interactions with Mr. Hooks and her lay opinion concerning his mental retardation. We therefore reject Mr. Hooks's *Brady* claim.

### 4. State-Law Evidentiary Errors

Mr. Hooks grounds two of his claims on errors of state law. First, he asserts that the trial court improperly prevented him from introducing evidence that Dr. Phillip Murphy, whose testing of Mr. Hooks in 1988 produced an IQ score of 80, had been subject to professional discipline. Second, he claims that the trial court admitted certain prejudicial and irrelevant evidence in violation of the OCCA's decision in *Lambert*, 71 P.3d at 31–32 (setting forth rules of procedure for postconviction mental-retardation proceedings).

Of course, "[f]ederal habeas review is not available to correct state law evidentiary errors." *Ochoa*, 669 F.3d at 1144 (quoting *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999)) (internal quotation marks omitted). As a habeas court, we sit only to vindicate an applicant's constitutional rights. Thus, Mr. Hooks is entitled to relief only if an alleged state-law error was "was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Revilla*, 283 F.3d at 1212 (alteration omitted) (quoting *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000)) (internal quotation marks omitted).

Reviewing Mr. Hooks's claims of error, we conclude that he has failed to demonstrate the existence of a state-law error, much less a "grossly prejudicial" one. *Revilla*, 283 F.3d at 1212 (quoting *Fox*, 200 F.3d at 1296) (internal quotation marks omitted). We begin with the first claim. Mr. Hooks sought to introduce evidence at the *Atkins* trial concerning Dr. Murphy's probationary status with the Oklahoma Board of Examiners of Psychologists. The State objected, claiming a discovery violation; the trial court agreed; and on appeal, the OCCA found no abuse of discretion. *See Hooks Atkins Appeal*, 126 P.3d at 643. Mr. Hooks tells us, with almost no elaboration, that the OCCA's conclusion contravenes *Atkins*. We are nonplused by that assertion. Mr. Hooks does not explain why the Oklahoma courts erred as a matter of state law, nor why any alleged error abridged "the fundamental fairness that is the essence of due process." *Revilla*, 283 F.3d at 1212 (quoting *Fox*, 200 F.3d at 1296) (internal quotation marks omitted). In light of the perfunctory treatment of this claim, we reject it.

With respect to his second claim, Mr. Hooks objects to the admission of three items of evidence: (1) testimony that he ran a prostitution ring, (2) a tape-recorded interview of him that allowed the jury to infer that he had murdered Ms. Blaine, and (3) testimony concerning his previous run-ins with law enforcement. He claims admitting this evidence violated the OCCA's *Lambert* decision. In his *Atkins* appeal, Mr. Hooks articulated this claim only with respect to the first two items of evidence. We exercise our discretion to consider all three items because the claim is without merit. *See* 18 U.S.C. § 2254(b); *Revilla*, 283 F.3d at 1211.

In *Lambert*, the OCCA held that the jury in an *Atkins* proceeding "should not hear evidence of the crimes for which [a defendant] was convicted, unless particular facts of the case are relevant to the issue of mental retardation." 71 P.3d at 31. On appeal from the *Atkins* jury's verdict, the OCCA concluded that the admission of prostitution-ring evidence and the tape-recorded interview did not violate *Lambert*. The court found that the prostitution-ring evidence was "relevant to the issue of mental retardation" because it showed "a level of abstract thought, coupled with the ability to carry out plans, which might be beyond the capabilities of a mentally retarded person." *Hooks Atkins Appeal*, 126 P.3d at 644. Furthermore, it concluded that the portions of the tape-recorded interview that were read to the jury contained "no reference" to the murder of Ms. Blaine and featured statements by Mr. Hooks concerning a number of daily activities, which were relevant to his "ability to understand and process information, to communicate, to function in society, and to care for himself and others." *Id.* The OCCA also found that "[t]he trial court scrupulously limited this evidence, focusing on those aspects which have some bearing on Hooks's mental abilities." *Id.* Because the relevance of the evidence was "not substantially outweighed by the danger of unfair prejudice," the OCCA concluded that the trial court had not abused its discretion in admitting it. *Id.* (citing Okla. Stat. tit. 12, § 2403).

The OCCA's factual findings are presumed correct under 18 U.S.C. § 2254(e)(1). Based on our independent review of the record, we conclude that the OCCA committed no error. At best, Mr. Hooks's arguments amount to disagreement with the OCCA

concerning the relevance and prejudicial effect of the evidence, but we are not persuaded that the OCCA was wrong.

First, the prostitution-ring evidence was highly relevant to the question of mental retardation and, in that light, not unfairly prejudicial. *See* 4 M.R. Tr. at 198–205 (Test. of Ms. Dinh); 5 M.R. Tr. at 57 (Test. of Dr. Hall). Second, the interview evidence was both relevant and not unfairly prejudicial. The portions of the interview presented to the jury were limited to statements by Mr. Hooks describing his daily activities and answering other questions about his life and relationships, and contained no reference to Ms. Blaine's murder. *See* 5 M.R. Tr. at 164–73 (reading of interview transcript by Messrs. Mullenix and Siderias).[17] Mr. Hooks says he was prejudiced because the jury was apparently able to piece together the facts of the crime in light of *other* evidence presented during the course of the *Atkins* trial. *See* Aplt. Opening Br. at 57. But the jury's ability to put two and two together does not make the interview evidence unfairly prejudicial, or the trial court's admission of it a violation of *Lambert* or the Oklahoma rules of evidence. Moreover, the admission most certainly does not abridge principles of fundamental fairness safeguarded by federal law.

With respect to the third item, which the OCCA did not consider, Mr. Hooks claims that the State was allowed to present testimony indicating that he had been

---

[17] In fact, in the interview, Mr. Hooks refers to Ms. Blaine in the present tense. *See* 5 M.R. Tr. at 166 ("She is 21 years of age."); *id.* (answering "Yes, sir" to the question "And is your wife pregnant now?").

convicted of armed robbery, arrested on a separate robbery charge, involved in many domestic disputes, and gotten into numerous fights in prison, all of which was "irrelevant to mental retardation." Aplt. Opening Br. at 56. The testimony that Mr. Hooks has in mind is that of Dr. Hall. *See* 5 M.R. Tr. at 26–29. As the district court found, this portion of Dr. Hall's testimony, which was never objected to, was

> focused on notations regarding Petitioner's activities while being evaluated at Eastern State Hospital and while in the custody of the Department of Corrections, events leading the hospital officials to suspect malingering by Petitioner, and evaluations that he not only was not mentally retarded but very intelligent, aggressive and dangerous. Dr. Hall's testimony of Petitioner's past evaluations and actions was not only relevant to her expert opinion, but also to demonstrate evidence countering Petitioner's claims of limitations in adaptive functioning.

*Hooks Habeas II*, 693 F. Supp. 2d at 1308 (citation omitted).

Thus, finding this rationale to be persuasive, we have no trouble concluding that Mr. Hooks has failed to demonstrate the existence of state-law error, much less a "grossly prejudicial" one. *Revilla*, 283 F.3d at 1212 (quoting *Fox*, 200 F.3d at 1296) (internal quotation marks omitted).

### 5. Ineffective Assistance of *Atkins* Counsel

We come, then, to Mr. Hooks's claim that counsel at his *Atkins* trial was ineffective. Under this heading, he raises several arguments. He asserts that his counsel was constitutionally deficient for failing to (1) obtain an additional IQ score, (2) investigate his functioning in prison, (3) secure Pat Prater as a witness, (4) uncover evidence to impeach Shanna Dinh, (5) comply with a discovery order related to evidence

-49-

of Dr. Murphy's probationary status, and (6) seek redaction of crime facts from the State's exhibits. Also, as a threshold matter, Mr. Hooks claims that the standard for counsel's performance here is *United States v. Cronic*, 466 U.S. 648 (1984), rather than *Strickland v. Washington*, 466 U.S. 668 (1984). The State counters that there is no right to counsel *at all* in an *Atkins* proceeding and also contests Mr. Hooks's claim on the merits.

As we explain below, we reject the State's threshold argument and hold that there is indeed a right to counsel in *Atkins* proceedings. We also reject Mr. Hooks's initial argument regarding the appropriate analytical framework, and thus apply *Strickland* rather than *Cronic*, because counsel was an active, zealous participant in the trial proceedings. On the merits of Mr. Hooks's claim, we ultimately conclude that counsel was not ineffective and the OCCA's decision so finding was not unreasonable.

### a. Right to Counsel in *Atkins* Proceedings

The State asserts at the outset that we need not review the merits of Mr. Hooks's ineffective-assistance claim because he has no right to counsel in an *Atkins* proceeding:

> [T]here is no clearly established federal law that guarantees Petitioner the right to counsel in a post-conviction mental retardation trial. The Sixth Amendment provides that "[i]n all *criminal* prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence." Post-conviction review "is not part of the criminal proceeding itself, and is in fact considered to be civil in nature." *Murray v. Giarratano*, 492 U.S. 1, 8 (1989). Therefore, the Supreme Court has held that "[t]here is no constitutional right to an attorney in state postconviction proceedings[,]" and, "[c]onsequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

-50-

Accordingly, Petitioner's claim must fail.

Aplee. Br. at 50 (alterations in original). As far as we can tell, this is a question of first impression in the federal courts. We reject the State's argument.

We have held that the Fourteenth Amendment's Due Process Clause applies as fully to an *Atkins* proceeding as to any other jury trial. *See Ochoa*, 669 F.3d at 1143. Included, or "implicit," within the "liberty" secured by the Due Process Clause is the Sixth Amendment right to effective assistance of counsel. *Gideon v. Wainwright*, 372 U.S. 335, 341–44 (1963). That right, "a bedrock principle in our justice system" and "the foundation for our adversary system," *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012), is grounded in the "obvious truth" that a person "cannot be assured a fair trial" without the effective advocacy of his attorney, *id.* (quoting *Gideon*, 372 U.S. at 344) (internal quotation marks omitted). On this basis alone, we think we are justified in holding that the right to effective assistance of counsel extends to jury-based *Atkins* proceedings of the kind employed in Oklahoma.

The State seeks to deflect this conclusion by analogizing an *Atkins* proceeding to state postconviction proceedings where, it is true, "[t]here is no constitutional right to an attorney." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). Whatever the value of that analogy in other contexts, it is merely superficial here. Mr. Hooks's *Atkins* trial was "postconviction" only in the strict chronological sense: *Atkins* was handed down in 2002, after Mr. Hooks had been convicted in 1989. Of far greater importance is that his 2004 *Atkins* trial was "the first designated proceeding" at which he could raise a claim of

-51-

mental retardation. *Martinez*, 132 S. Ct. at 1317. No court had yet addressed his claim, the *Atkins* jury was the first to consider its merit, and Mr. Hooks had no "brief from counsel or an opinion of the court" on the issue. *Id.* In that situation, with Mr. Hooks surely "ill equipped to represent [himself]," *id.* (quoting *Halbert v. Michigan*, 545 U.S. 605, 617 (2005)) (internal quotation marks omitted), the usual rationale for denying a right to counsel in postconviction proceedings is inapposite, *cf. id.*[18]

In any event, we think the State's analogy also fails for a different reason. It is beyond cavil that "the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). Under this rubric, whether Mr. Hooks has a right to counsel at his *Atkins* trial depends on two things: Is such a trial part of the "criminal proceedings"? And is it a "critical stage" of them? On the first question, contrary to the State's contention, we think an *Atkins* trial is "part of the criminal proceeding itself" and not "civil in nature." *Giarratano*, 492 U.S. at 8 (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 556–57 (1987)) (internal quotation marks omitted). In one sense, it is analogous to a competency hearing. *See United States v. Collins*, 430 F.3d 1260, 1264 (10th Cir. 2005) (holding that a competency hearing is a "critical stage" of the criminal proceedings such that the Sixth Amendment right to counsel attaches, and citing other circuits that agree).

---

[18] We wonder, too, whether the retroactive applicability of *Atkins* to cases on collateral review under 28 U.S.C. § 2244(b)(2)(A)—"the only such new rule" since AEDPA's enactment in 1996, *Ochoa*, 669 F.3d at 1142 n.9—makes void, as a matter of law, any "*post*conviction" character that an *Atkins* proceeding might have.

More importantly, an *Atkins* trial is inextricably intertwined with sentencing. *See Atkins*, 536 U.S. at 321 ("[The Eighth Amendment] 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." (quoting *Ford*, 477 U.S. at 405)). And there is no doubt that sentencing is part of the criminal proceedings. *See Mempa v. Rhay*, 389 U.S. 128, 137 (1967) (holding that sentencing is a "critical stage" of the criminal proceedings such that the Sixth Amendment right to counsel attaches). As to the second question, we harbor little doubt that an *Atkins* trial is a "critical stage," that is, "a step of a criminal proceeding" that holds "significant consequences for the accused." *Cone*, 535 U.S. at 696. We are hard-pressed to imagine a more "significant consequence[] for the accused" than a determination of whether the State has the power to take his life.

We come, then, to the question of clearly established federal law. We have concluded that defendants in *Atkins* proceedings have the right to effective counsel secured by the Sixth and Fourteenth Amendments. But that does not perforce answer the question of whether that right is clearly established. Based on our analysis below of the nature of the right and its nexus to the proceedings allowable under *Atkins*, however, we further conclude that the right to counsel flows directly from, and is a *necessary* corollary to, the clearly established law of *Atkins*. *Cf. Ochoa*, 669 F.3d at 1143. Consequently, we hold that the right to counsel in *Atkins* proceedings is "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). To be sure, as we must, we acknowledge that the Supreme Court has never said that defendants

have a right to counsel in *Atkins* proceedings, nor has it ever identified such a proceeding as one of the "critical stages" to which the right attaches. So it might be said that the Court's "cases provide no categorical answer" to our question, *Van Patten*, 552 U.S. at 125, or that the Court "has never addressed [this] claim," *Musladin*, 549 U.S. at 76. But we are deeply troubled by that prospect and find that reasoning to be ultimately untenable under the law. The idea that a mentally retarded defendant has a right not to be executed by the State, but not a right to counsel in proceedings where the question of mental retardation will be determined, smacks of the absurd. Can a person with "diminished capacities to understand and process information, to communicate, . . . [and] to engage in logical reasoning," *Atkins*, 536 U.S. at 318, be expected to argue his own condition to a court or jury? On the contrary, the more persuasively he argued his case, the more he would doom it, and if he could not *help* but perform poorly, he would be unable to carry his burden of proof. Having no right to counsel in a mental-retardation proceeding—at least where that proceeding is the first opportunity to raise a claim of mental retardation—could render *Atkins* a nullity.

We "should not be ignorant as judges of what we know as" human beings. *Watts v. Indiana*, 338 U.S. 49, 52 (1949) (plurality opinion). Guideposts erected long ago mark out the proper path here. The right to counsel is "fundamental and essential to a fair trial"—a necessity, not a luxury. *Gideon*, 372 U.S. at 342, 344 (quoting *Betts v. Brady*, 316 U.S. 455, 465 (1942)) (internal quotation marks omitted).

> [The defendant] requires the guiding hand of counsel at every step in

> the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, *how much more true is it of the ignorant and illiterate, or those of feeble intellect*.

*Powell v. Alabama*, 287 U.S. 45, 69 (1932) (emphasis added). We think these concerns are heightened still further when a defendant's life, rather than liberty, is at stake. *See Gardner v. Florida*, 430 U.S. 349, 357 (1977) (plurality opinion) ("[D]eath is a different kind of punishment from any other which may be imposed in this country.").

Therefore, we hold that defendants in *Atkins* proceedings have the right to effective counsel secured by the Sixth and Fourteenth Amendments—a right that stems directly from, and is a necessary corollary to, *Atkins*. For that reason, we further hold that the right to counsel in *Atkins* proceedings is "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

### b. The relevant standard: *Strickland*

Because there is a right to counsel in *Atkins* proceedings, we must next determine which standard governs counsel's performance. Generally, ineffective-assistance-of-counsel claims are analyzed under the rubric of *Strickland*. *See Byrd*, 645 F.3d at 1167. But Mr. Hooks argues that *Cronic*, rather than *Strickland*, applies in this case. In *Cronic*, decided the same day as *Strickland*, the Supreme Court recognized that there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658. The Court in *Cronic* set forth "three situations when *Strickland* does not apply" such that a court may "presume

-55-

prejudice without inquiring into counsel's performance." *Danny Hooks v. Workman*, 606

F.3d 715, 724 (10th Cir. 2010).[19] Mr. Hooks asserts that his *Atkins* trial involved the

second of the three: "a breakdown in the adversarial process." *Cronic*, 466 U.S. at 662.

According to Mr. Hooks, when *Atkins* was decided, it "created a log jam" of cases in the

Oklahoma criminal defense system, with insufficient resources and staff to handle them,

and his case was assigned to attorneys whose experience involved postconviction

proceedings, not criminal jury trials. Aplt. Opening Br. at 64.

Standing alone, these circumstances do not warrant a presumption of prejudice.

When the Court in *Cronic* spoke of "a breakdown in the adversarial process," it

envisioned a situation in which "counsel *entirely fails* to subject the prosecution's case to

meaningful adversarial testing." 466 U.S. at 659, 662 (emphasis added). This means that

"the attorney's failure must be complete." *Cone*, 535 U.S. at 697. It is not enough even

that defense counsel "failed to [oppose the prosecution] at specific points." *Id.* Rather,

for *Cronic*'s presumption to apply, that failure must run "throughout the . . . proceeding

as a whole." *Id.* Plainly, this kind of case will be an "unusual" one. *Davis v. Exec. Dir.*

*of Dep't of Corr.*, 100 F.3d 750, 757 n.3 (10th Cir. 1996).

This is simply not a case in which counsel "entirely fail[ed] to subject the

prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. The

---

[19] Our decision in *Danny Hooks v. Workman*, 606 F.3d 715 (10th Cir. 2010), involved a § 2254 petition by Oklahoma prisoner Danny Keith Hooks. That case is unrelated to this one.

-56-

record reveals a vigorous adversarial trial, with numerous objections by Mr. Hooks's counsel, poignant cross-examination of the State's witnesses, several side bars with the court to advance Mr. Hooks's cause, and a competent closing argument. *See Cooks v. Ward*, 165 F.3d 1283, 1296 (10th Cir. 1998) (holding that *Cronic* did not apply because counsel "conducted limited cross-examination, made evidentiary objections, and gave a closing argument"); *Hooper v. Mullin*, 314 F.3d 1162, 1175 (10th Cir. 2002) (holding that *Cronic* did not apply because "[d]efense counsel cross-examined the State's guilt-stage witnesses, made objections to the State's evidence, presented some evidence in Petitioner's defense, and made opening and closing arguments"). The fact that attorneys assigned to Mr. Hooks's case were responsible for a number of *Atkins* cases at the time, or that they had no experience with criminal jury trials, may bear upon actual performance but does not warrant application of *Cronic*. *See Cronic*, 466 U.S. at 665 ("The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation.").[20]

Because we find that counsel for Mr. Hooks actively and zealously participated in all phases of the trial proceedings, we will not presume prejudice under *Cronic*. *Strickland*, therefore, remains the appropriate standard for evaluating counsel's

---

[20] We also take note of the OCCA's finding that "the record reflects that counsel is qualified and able to represent defendants in capital mental retardation proceedings." *Hooks Atkins Collateral*, slip op. at 8. That finding is presumed correct under § 2254(e)(1), and Mr. Hooks has not rebutted it.

performance. *See Hooks*, 606 F.3d at 725. Mr. Hooks "must show both that his counsel's performance 'fell below an objective standard of reasonableness' and that 'the deficient performance prejudiced the defense.'" *Byrd*, 645 F.3d at 1167 (emphasis omitted) (quoting *Strickland*, 466 U.S. at 687–88). These two prongs may be addressed in any order, and failure to satisfy either is dispositive. *Id.*

"[O]ur review of counsel's performance under the first prong of *Strickland* is a 'highly deferential' one." *Id.* at 1168 (quoting *Hooks*, 606 F.3d at 723). "Every effort must be made to evaluate the conduct from counsel's perspective at the time . . . ." *United States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009) (quoting *Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir. 1994)) (internal quotation marks omitted). Furthermore, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Byrd*, 645 F.3d at 1168 (alteration omitted) (quoting *Dever*, 36 F.3d at 1537) (internal quotation marks omitted). Surmounting this "high bar" is not an "easy task." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010)) (internal quotation marks omitted); *see Fox*, 200 F.3d at 1295 ("[Petitioner] bears a heavy burden in that he must overcome the presumption that his counsel's actions were sound trial strategy . . . .").

A state prisoner in the § 2254 context faces an even greater challenge. *Byrd*, 645 F.3d at 1168. "[W]hen assessing a state prisoner's ineffective-assistance-of-counsel claims on habeas review, '[w]e defer to the state court's determination that counsel's

performance was not deficient and, further, defer to the attorney's decision in how to best represent a client.'" *Id.* (second alteration in original) (quoting *Crawley v. Dinwiddie*, 584 F.3d 916, 922 (10th Cir. 2009)). As the Supreme Court has explained, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Thus, our review of ineffective-assistance claims in habeas applications under § 2254 is "doubly deferential." *Id.* "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788.

The second prong of *Strickland*—prejudice—requires an applicant to show "that there is a reasonable probability that, but for the counsel's error, 'the result of the proceeding would have been different.'" *Challoner*, 583 F.3d at 749 (quoting *Strickland*, 466 U.S. at 688). Reasonable probability is more than mere speculation, and an applicant must show more than "some conceivable effect on the outcome of the proceeding." *Turrentine v. Mullin*, 390 F.3d 1181, 1205 (10th Cir. 2004) (quoting *Strickland*, 466 U.S. at 693) (internal quotation marks omitted). Rather, "'reasonable probability is a probability sufficient to undermine confidence in the outcome' of the trial." *Byrd*, 645 F.3d at 1168 (quoting *Strickland*, 466 U.S. at 694).

With one exception, which relates to counsel's failure to redact certain letters, the OCCA denied relief on all of the instances of ineffective assistance alleged by Mr. Hooks

under the second (prejudice) prong of *Strickland.* This was an entirely appropriate mode of analysis. Indeed, the Supreme Court in *Strickland* intimated that resolving ineffective-assistance claims on prejudice grounds may be preferable: "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697. Of course, this is not a hard and fast rule, and *Strickland* contemplates that relative ease in certain cases may (though not "often") counsel resolution under the performance rather than prejudice prong. We believe this is such a case. We could, as the OCCA did, resolve each of Mr. Hooks's allegations of ineffective assistance on prejudice grounds. That, however, would not be sufficient to dispose of the claim because a further analysis of "cumulative prejudice" would be necessary. *See Spears*, 343 F.3d at 1251 (considering the cumulative impact of prejudice "assuming that [petitioner's] attorney was deficient" in two respects); *Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003) ("[A] decision to grant relief on ineffective assistance grounds is a function of the prejudice flowing from *all* of counsel's deficient performance . . . ." (emphasis added)). The cumulative-prejudice analysis is sometimes difficult to conduct because, whether we assume or determine that counsel performed unreasonably, we must assess the aggregate impact of these numerous errors and decide whether they collectively "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Wilson v. Sirmons*, 536 F.3d 1064, 1122 (10th Cir. 2008) (quoting *Thornburg v. Mullin*, 422 F.3d 1113, 1137 (10th Cir. 2005))

-60-

(internal quotation marks omitted).

In this case, save for one instance—which relates to Mr. Hooks's counsel's failure to comply with a discovery order—we believe the performance prong of *Strickland* provides "a more certain basis" for resolving Mr. Hooks's ineffective-assistance claim, even though the state court rested its conclusions on lack of prejudice. *Pondexter v. Quarterman*, 537 F.3d 511, 521 (5th Cir. 2008). Accordingly, taking into account its impact on the standard of review, we follow that course in our analysis below. *Cf. Gilson v. Sirmons*, 520 F.3d 1196, 1248 (10th Cir. 2008) (finding it "unnecessary" to address the first *Strickland* prong, even though the OCCA resolved the ineffective-assistance claim on that ground, because "applying a de novo standard of review" the applicant could not satisfy the second *Strickland* prong). More specifically, in those instances where the OCCA did not address the performance prong of *Strickland* and we elect to do so, our review is de novo. *See id.*; *Pondexter*, 537 F.3d at 524; *see also Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine [the prejudice] element of the *Strickland* claim *de novo* . . . ." (citation omitted)).[21]

### c. Failure to obtain an additional IQ score

Mr. Hooks argues that his *Atkins* counsel was deficient for failing to obtain a more recent IQ score. He points to testing done in 2006, two years after the *Atkins* proceeding,

---

[21] We reiterate that there was nothing improper about the OCCA's tackling most of counsel's alleged errors on prejudice, rather than performance, grounds.

that pegged his IQ at 67. On collateral review, the OCCA found that Mr. Hooks was not prejudiced by counsel's failure to order additional testing. *See Hooks Atkins Collateral*, slip op. at 9–10.

Applying de novo review, we conclude that counsel did not act unreasonably in failing to order an additional IQ test. A wide range of IQ scores was already available for presentation at trial, some low and some high. Indeed, the jury was presented with nine IQ scores ranging from 53 to 80. Mr. Hooks's counsel was almost certainly aware that IQ scores remain fairly stable over a person's lifetime, *see Ochoa*, 669 F.3d at 1137 n.6 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 40 (4th ed.1994)), and could reasonably think that an additional score would not be significantly different than the scores already available. Further, counsel could not know in advance what the results of the test would be. The 2006 post-trial test resulted in a score of 67, but at the time of trial, counsel could equally have anticipated a higher score—up to 80—if the existing range of scores was any guide. We evaluate conduct from counsel's perspective at the time, not in hindsight. *Rompilla*, 545 U.S. at 381 ("[I]n applying *Strickland* . . . , hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made and by giving a heavy measure of deference to counsel's judgments." (citation omitted) (quoting *Strickland*, 466 U.S. at 689, 691) (internal quotation marks omitted)); *see also Challoner*, 583 F.3d at 749. We conclude that counsel made a reasonable decision not to order an additional IQ score and that her performance was not unreasonable under *Strickland*.

**d. Failure to investigate functioning in prison**

Mr. Hooks asserts that counsel was deficient for failing to investigate his "adaptive functioning during his fifteen year stay on death row," which would have revealed that he had help writing the letters on which the State relied to show his communicative abilities and that he had not in fact participated in an allegedly improper scheme involving the use of the mails to solicit and obtain money from women that supposedly he describes in one of the letters. Aplt. Opening Br. at 67–68. With respect to letter-writing assistance, Mr. Hooks points to post-trial affidavits from fellow prisoners Walanzo Robinson and Paris Powell, both of whom state that they have assisted Mr. Hooks from time to time in reading and writing letters. *See* R., Vol. 1, pt. 2 at 435–36 (Aff. of Walanzo Robinson, dated Mar. 9, 2003); *id.* at 438–42 (Aff. of Paris Powell, dated Dec. 29, 2004). With respect to the scheme, Mr. Hooks points to prison records tending to show that he was not involved. *See* Aplt. Opening Br. at 67. The OCCA resolved this aspect of Mr. Hooks's claim by concluding that he was not prejudiced by counsel's failure in light of "other significant evidence bearing on Hooks's intellectual and adaptive functioning." *Hooks Atkins Collateral*, slip op. 10–12. We resolve this issue de novo under the first prong of *Strickland*.

We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and that "the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Mr. Hooks has not overcome that presumption

-63-

here. First, the referenced affidavits allege only *generally* that Messrs. Robinson and Powell assisted Mr. Hooks in writing letters from time to time. There is no evidence that these individuals assisted Mr. Hooks in writing the specific letters admitted into evidence at the *Atkins* trial. Second, while Mr. Hooks's counsel has stated that she did not have time to investigate "fully" whether "Mr. Hooks had assistance from other inmates writing the letters," R., Vol. 1, pt. 2 at 462 (Aff. of Vicki Werneke, dated Mar. 8, 2006), she did attempt at several points to cast doubt on whether Mr. Hooks had written the letters on his own, eliciting testimony from Dr. Cowardin that Mr. Hooks performed poorly on writing tests, had to use a straightedge to write, and had to use a dictionary to spell correctly. *See* 4 M.R. Tr. at 178–79, 184, 187–88.

Finally, there is at least a suggestion that relying on testimony of fellow prisoners would have been not only fruitless, but also harmful. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987) (holding that a limited investigation by counsel was reasonable because witnesses brought to counsel's attention would have provided potentially damaging information). In one of the letters, Mr. Hooks seemingly referred to the scheme of his that was discovered. *See* State Ex. to M.R. 1 (Letter from Victor Hooks to Shalimar Hooks, dated Aug. 18, 2002) ("[T]hese damn 'Hillbillies' sweatin me. They cut my hustle off through the mail. . . . [C]ause this 'one-stupid-white-bitch', was sending me her money . . . ." (emphases omitted)). The trial transcript suggests that Mr. Hooks's counsel was aware of the scheme and also suspected Mr. Hooks's cell-mate of being involved. *See* 5 M.R. Tr. at 102 (cross-examination of Dr. Hall). A reasonable attorney could have

wanted to avoid drawing more attention to the letters than necessary and could have surmised that allowing fellow prisoners to testify might open them up to cross-examination about Mr. Hooks's knowledge of their improper scheme. In that light, relying on objective testing of writing skills, such as that administered by Dr. Cowardin, would have been the sounder strategy. *See* 4 M.R. Tr. at 187–88. We therefore conclude that counsel's performance was not unreasonable under *Strickland*.

### e. Failure to call Pat Prater as a witness

Mr. Hooks alleges that counsel performed deficiently when she failed to secure Pat Prater as a witness after seeing the memorandum from Ms. High. (As earlier discussed, the memorandum summarized a conversation between Ms. High and Ms. Prater regarding the latter's observations of and interactions with Mr. Hooks.) Mr. Hooks believes that "Ms. Prater would have provided objective evidence of Petitioner's significant adaptive deficits and an opinion he was mentally retarded." Aplt. Opening Br. at 68. The OCCA resolved this claim on prejudice grounds, concluding that "there is not a reasonable probability that, with this evidence, jurors would have found Hooks was mentally retarded." *Hooks Atkins Collateral*, slip op. at 14. We resolve this issue de novo under the first prong of *Strickland*.

Trial counsel does not act unreasonably in failing to call every conceivable witness that might testify on a defendant's behalf. *See Crittenden v. Ayers*, 624 F.3d 943, 967 (9th Cir. 2010) ("Trial counsel's duty to investigate . . . does not necessarily require that every conceivable witness be interviewed." (omission in original) (quoting *Douglas v.*

*Woodford*, 316 F.3d 1079, 1088 (9th Cir. 2003)) (internal quotation marks omitted)); *see also Rompilla*, 545 U.S. at 383 ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up."). The information in the memorandum received by Mr. Hooks's counsel pointed to a lay witness, Ms. Prater, who could testify that her observations of Mr. Hooks, particularly his conversational abilities, indicate that he is mentally retarded. This was not novel information. Mr. Hooks called two expert witnesses who related substantially the same information to the jury. *See* 3 M.R. at 191–94 (Test. of Dr. Gelbort); 4 M.R. at 74–78, 81–82, 101–02, 116 (Test. of Dr. Cowardin). Counsel must be allowed leeway in prioritizing the evidence and witnesses she puts on. *See Rompilla*, 545 U.S. at 383 ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). In light of the fact that the legal definition of mental retardation tracks the clinical definition, we may fairly view counsel here as making a reasonable, strategic decision to focus on expert rather than lay witnesses, and she reasonably could have believed that Ms. Prater's testimony would have been duplicative or unhelpful. *See Matthews*, 577 F.3d at 1192–93 (holding that trial counsel was not ineffective for failing to call witnesses whose testimony "would have been largely cumulative of evidence the jury did hear"). We therefore conclude that counsel's performance was not unreasonable under *Strickland*.

**f. Failure to uncover evidence to impeach Shanna Dinh**

Mr. Hooks claims that counsel was ineffective because she failed to contact Shanna Dinh's ex-husband, Cuc Van Dinh, who could have testified that he and Ms. Dinh

lived together during the time that she claimed to have been living with Mr. Hooks. The OCCA resolved the claim on prejudice grounds, concluding that "[w]hether Dinh lived with Hooks for months or years, her testimony went to her observations of his behavior and mental ability." *Hooks Atkins Collateral*, slip op. at 15. We resolve this issue de novo under the first prong of *Strickland*.

It is worth noting that Ms. Dinh's story appears to be so convoluted that unraveling the truth is impossible on the record before us. Ms. Dinh claimed at the *Atkins* trial that she lived with Mr. Hooks "90 percent of the time" between 1984 and 1987. 4 M.R. Tr. at 198. In 1989, during the murder trial, she claimed to have lived with him for "a couple of months" during that period. 2 Trial Tr. at 413 (Test. of Ms. Dinh). Meanwhile, Mr. Hooks's counsel was aware of a presentence investigation report indicating that Ms. Dinh was in foster care during that same time period. *See* 4 M.R. Tr. at 218 (statement of Ms. Werneke to the court). To muddy the waters further, the affidavit of Cuc Van Dinh states that Ms. Dinh was living with him during that time period and not "with anyone else." R., Vol. 1, pt. 2 at 477 (Aff. of Cuc Van Dinh, dated Jan. 19, 2005). Finally, on direct appeal from Mr. Hooks's *Atkins* trial, the OCCA stated that "[s]ubsequent investigation indicates that [Ms.] Dinh's husband had [later] filed for divorce, claiming abandonment." *Hooks Atkins Appeal*, 126 P.3d at 643 n.21. Abandonment would cast doubt on Mr. Dinh's claims that he and Ms. Dinh were living together during the period in question.

No doubt, counsel for Mr. Hooks was as confused as we are. We note, however, that she did not neglect to impeach Ms. Dinh. On cross-examination, she sought to

highlight one of these discrepancies in Ms. Dinh's story, asking twice whether Ms. Dinh was in foster care at the time she claimed to have been living with Mr. Hooks. *See* 4 M.R. Tr. at 217, 220–21. Ms. Dinh denied the allegation both times.

Counsel was not unreasonable for choosing to focus on only one of the discrepancies in Ms. Dinh's story. Indeed, counsel could have reasonably believed that bringing Cuc Van Dinh's putative testimony to light would have undermined her own strategy. Specifically, if counsel had suggested that Ms. Dinh was *both* in foster care *and* living with her husband during the relevant period, the jury may have perceived the conflict. Moreover, if counsel was aware that Cuc Van Dinh had claimed abandonment in his divorce proceedings, she reasonably could have concluded that Mr. Dinh was likely susceptible to strong impeachment by the State, which would have further weakened Mr. Hooks's case. Because there is good reason to believe that counsel made a reasonable, strategic decision not to seek the testimony of Cuc Van Dinh, we conclude that her performance was not unreasonable under *Strickland*.

### g. Failure to comply with a discovery order

Mr. Hooks alleges that counsel was constitutionally deficient because her failure to comply with a discovery order disabled her from introducing evidence that Dr. Murphy had been professionally disciplined, a fact bearing on the reliability of his IQ testing of Mr. Hooks; his test resulted in a score of 80. The OCCA resolved the issue on prejudice grounds, noting that the score obtained by Dr. Murphy "was one of a range of test scores, that the information about this test was sparse, that no expert relied on it in forming their

opinion of Hooks's abilities, and that evidence discrediting Murphy could not have affected the jury's determination." *Hooks Atkins Collateral*, slip op. at 16. We resolve this issue, like the OCCA, on prejudice grounds, and we defer to the OCCA's determination under AEDPA.

To show prejudice under the second prong of *Strickland*, Mr. Hooks must establish "that there is a reasonable probability that, but for the counsel's error, 'the result of the proceeding would have been different.'" *Challoner*, 583 F.3d at 749 (quoting *Strickland*, 466 U.S. at 688). "'[R]easonable probability is a probability sufficient to undermine confidence in the outcome' of the trial." *Byrd*, 645 F.3d at 1168 (quoting *Strickland*, 466 U.S. at 694). Mr. Hooks has not carried his burden here. As the OCCA found on direct appeal and in collateral proceedings, no expert (for the State or Mr. Hooks) relied on Dr. Murphy's test score in forming an opinion regarding Mr. Hooks's mental abilities. *Hooks Atkins Appeal*, 126 P.3d at 643; *Hooks Atkins Collateral*, slip op. at 16. Moreover, the OCCA found that "[t]he expert witnesses agreed that the most reliable scores were those obtained by Dr. Gelbort and Dr. Cowardin, with results of 72 and 76." *Hooks Atkins Appeal*, 126 P.3d at 640. Mr. Hooks contends only that "there is no assurance" that the jury did not rely on Dr. Murphy's score. Aplt. Opening Br. at 70. That is simply not enough to establish a "reasonable probability" of a different result, particularly when the other evidence of Mr. Hooks's intellectual and functional abilities is considered. Consequently, Mr. Hooks has failed to show that the OCCA's adjudication of this claim resulted in an unreasonable application of *Strickland*.

-69-

**h. Failure to seek redaction of crime facts from the State's exhibits**

Mr. Hooks asserts ineffective assistance for counsel's failure to redact "crime facts" from letters written by Mr. Hooks and admitted at trial. Aplt. Opening Br. at 71. Specifically, he claims that "[t]he letters contained references to Petitioner's victim and the fact she was no longer 'out there' to care for her daughter." *Id.* The OCCA did not review the letters because Mr. Hooks did not attach them as exhibits to his habeas application. *See Hooks Atkins Collateral*, slip op. at 16. However, relying on a portion of a letter that Mr. Hooks quoted in his postconviction application, the OCCA found that there were "no references to the facts of murder of which Hooks was convicted." *Id.* Accordingly, the OCCA concluded that "[n]othing properly before this Court suggests that the jury was informed of the facts of the crime," and that it would "not find counsel was ineffective for failing to . . . redact information in the letters."[22] *Id.* at 17.

The letters are available in the record before us. Only two of the six letters mention Ms. Blaine. Those letters were the focus of Mr. Hooks's arguments before the OCCA. Like the OCCA, we resolve this issue under the first prong of *Strickland*, according AEDPA deference to the OCCA's decision. In doing so, we recognize that there is a significant question regarding whether we are authorized under AEDPA and,

_____

[22]     Mr. Hooks asserts that "[t]rial counsel admitted she did not review the letters prior to trial." Aplt. Opening Br. at 71. Actually, counsel has stated that she *did* review the letters prior to trial, just not immediately prior. *See* R., Vol. 1, pt. 2 at 462 ("At the time of the evidentiary hearing, I had read [the letters] thoroughly. However, I failed to review them again before the trial.").

more specifically, the Supreme Court's holding in *Pinholster*, to review the full text of the

two letters. We recall that, in *Pinholster*, the Court observed that § 2254 (d)(1) employs

"backward-looking language" indicating that "the record under review is limited to the

record in existence at th[e] same time [the state-court decision is made] *i.e.*, the record

before the state court." 131 S. Ct. at 1398. Although this clear and unequivocal language

would seemingly foreclose any review under § 2254(d)(1) of any materials that were not

before the state court rendering the adverse decision, the circumstances of this case are

somewhat unique: the two letters *were presented* to the state trial court and the jury in the

metal-retardation proceeding, were referred to by Mr. Hooks in his briefing before the

OCCA (although inexplicably omitted from the exhibits submitted to the OCCA), and

were addressed on the merits to a significant degree by the OCCA in ruling against Mr.

Hooks. It may be questionable (perhaps even doubtful) whether even these circumstances

would be enough for Mr. Hooks to escape *Pinholster*'s holding, but we need not

definitively determine the matter because, even if we review the full text of the two

letters, Mr. Hooks cannot prevail on this claim of error.[23] *Cf. id.* at 1399 ("It would be

contrary to that purpose [of requiring state-court exhaustion of remedies] to allow a

petitioner *to overcome* an adverse state-court decision with new evidence introduced in a

---

[23] In its pre-*Pinholster* decision, the district court did consider all of the letters. However, it found that "the letter set out here *and* at the OCCA by Petitioner is the only one with any allegedly questionable language referring to the murder," *Hooks Habeas II*, 693 F. Supp. 2d at 1322 (emphasis added), and concluded that the OCCA did not unreasonably apply *Strickland* in ruling that Mr. Hooks's counsel was not constitutionally deficient for failing to redact that language.

federal habeas court and reviewed by that court in the first instance effectively *de novo*." (emphasis added)).

In the first letter, Mr. Hooks scolded his daughter for some trouble she had found herself in, and he stated, "I know for a <u>fact</u> if Shalimein was out there she would of kick-yo-ass all the way to the berry house. <u>Cause she love you and don't want nothing bad to happen to you Shalimar</u>. You already know if I was out there you wouldn't be caught-up in no shit like that <u>none</u>." State's Ex. 2 to M.R. In the second letter, Mr. Hooks states that a particular look from his daughter

> would <u>tear-at-my-heart</u> cause your "mom" would look at me the same way. <u>"LORD" know's I done everything I could do to protect [and] "save her."</u> <u>Shalimar if I had a choice she would be with you now. "I love you all that way."</u> I wish I hadn't loved her. Maybe she would still be out there, I don't know.

State's Ex. 6 to M.R.

The two letters contain no reference to the murder of Ms. Blaine. Both letters referred to Ms. Blaine as not being "out there," although in the first letter, Mr. Hooks also referred to himself as not being "out there." A juror *could* infer that Mr. Hooks was talking about the death of Ms. Blaine in these references (as opposed to, for example, talking about her being in prison like Mr. Hooks). Even so, it would require a further inferential leap to conclude that Mr. Hooks was responsible for her death, especially since he pledged that he had "done everything [he] could to protect [and] save" Ms. Blaine and that "if [he] had a choice, she would be with [his daughter] now." State's Ex. 6 to M.R. (internal quotation marks omitted). Counsel for Mr. Hooks has averred that she read the

letters "thoroughly" prior to trial. R., Vol. 1, pt. 2 at 462. In light of the vague and contradictory nature of the letters, counsel did not act unreasonably in failing to seek redaction, nor did the OCCA unreasonably apply *Strickland* in reaching the same conclusion.

### 6. Cumulative Error

Finally, Mr. Hooks asserts cumulative error arising out the numerous constitutional errors that he alleges occurred during his *Atkins* trial. The parties dispute whether the OCCA addressed cumulative error. Mr. Hooks asserts that it did not. *See* Aplt. Opening Br. at 71–72. The State urges that the OCCA *did* address it, but the State's argument focuses only on cumulative error in the context of the ineffective-assistance claim. *See* Aplee. Br. at 65–66. Even if the State is right that the OCCA assessed cumulative error pursuant to the ineffective-assistance claim, Mr. Hooks's cumulative-error claim is clearly broader and encompasses *all* of the alleged errors arising out of the *Atkins* trial, not just errors allegedly committed by counsel. *See Cargle*, 317 F.3d at 1207 ("Consistent with the unqualified reference to *all* errors, our cases reflect application of cumulative-error review to legally diverse claims such as those here."). The OCCA never addressed this cumulative-error claim, so our review is de novo. *See id.* at 1206.[24]

_____

[24] We note that there is a split in the circuits on whether the need to conduct a cumulative-error analysis is clearly established federal law under § 2254(d)(1). *Compare Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("[C]umulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."), *with Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) ("[T]he Supreme Court has clearly
(continued...)

-73-

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Id.* (quoting *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002)) (internal quotation marks omitted). However, as the term "cumulative" suggests, "[c]umulative-error analysis applies where there are two or more actual errors. It does not apply . . . to the cumulative effect of non-errors." *Moore v. Gibson*, 195 F.3d 1152, 1175 (10th Cir. 1999) (quoting *Castro v. Ward*, 138 F.3d 810, 832 (10th Cir. 1998)) (internal quotation marks omitted). Thus, we undertake a cumulative-error analysis only if there are at least two errors. *See United*

---

[24](...continued)
established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3, 298, 302–03 (1973))), *and Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) (reserving judgment on the issue). In the context of ineffective-assistance claims, we arguably have indicated that, for AEDPA purposes, the cumulative-error inquiry is clearly established federal law. *See Cargle*, 317 F.3d at 1212 ("[O]ur decision to grant relief on ineffective assistance grounds is a function of the prejudice flowing from all of counsel's deficient performance—as *Strickland* directs it to be."). Although we have never expressly held in other contexts that cumulative-error analysis is clearly established federal law, we have long conducted cumulative-error analyses in our review of federal habeas claims. *See, e.g.*, *Ochoa*, 669 F.3d at 1146; *Wilson*, 536 F.3d at 1123. We have described the doctrine as "an extension of the harmless-error rule." *Cargle*, 317 F.3d at 1220 (quoting *United States v. Rivera*, 900 F.2d 1462, 1469, 1470 (10th Cir. 1990)) (internal quotation marks omitted). This body of precedent may very well signal where our court has come down on the issue—*viz.*, that cumulative-error analysis is clearly established federal law. However, to the extent that this remains an open issue in this circuit, we need not definitively resolve it here. As noted *infra*, we have no occasion to employ cumulative-analysis in this case because our review has detected, at most, one error in Mr. Hooks's *Atkins* trial.

-74-

*States v. Franklin-El*, 555 F.3d 1115, 1128 (10th Cir. 2009). Assessing cumulative error

is not appropriate here because there was, at most, one error in Mr. Hooks's *Atkins* trial:

counsel's commission of a discovery violation, which we assumed to be unreasonable

performance and found did not result in a prejudice under *Strickland*. Because there are

not "at least two" errors here, a cumulative-error analysis is not warranted. *Id.*; *see also*

*Ochoa*, 669 F.3d at 1146 ("Because there are no additional constitutional errors to

aggregate, Ochoa's cumulative error claim necessarily fails.").

## D. Fairness of the Original Trial

Mr. Hooks's third and final ground for habeas relief is that counsel was ineffective

during the guilt and sentencing phases of his original trial in 1989. This claim comes to

us in Appeal No. 03-6049 and was not adjudicated on the merits in state court.

Accordingly, we do not view the claim through the lens of AEDPA and instead exercise

our "independent judgment." *McCracken*, 268 F.3d at 975. "[W]e review the district

court's legal conclusions de novo and its factual findings, if any, for clear error." *Spears*,

343 F.3d at 1225. "[I]f the district court based its factual findings entirely on the state

court record, we review that record independently." *Byrd*, 645 F.3d at 1167 (quoting

*Bland*, 459 F.3d at 1010) (internal quotation marks omitted). Any state-court findings of

fact relevant to a federal habeas claim are presumed correct unless clearly and

convincingly rebutted. *See Hooks v. Ward*, 184 F.3d at 1223.

The familiar two-prong standard of *Strickland* applies to Mr. Hooks's ineffective

assistance claim. He "must show both that his counsel's performance 'fell below an

objective standard of reasonableness' and that 'the deficient performance prejudiced the defense.'" *Byrd*, 645 F.3d at 1167 (emphasis omitted) (quoting *Strickland*, 466 U.S. at 687–88). Because we are reviewing this ineffective-assistance claim de novo, we judge the reasonableness of counsel's performance without applying AEDPA's double dose of deference. To preview our analysis below, we reject Mr. Hooks's claim that counsel was ineffective during the guilt phase of his trial. However, we conditionally grant habeas relief with respect to his death sentence because counsel rendered deficient, prejudicial performance during the sentencing phase.

### 1. Counsel's Performance During the Guilt Phase

Mr. Hooks claims that counsel was ineffective during the guilt phase of his trial because counsel failed (1) to pursue an insanity defense, and (2) to secure witness Carol Hill. We conclude that counsel was not ineffective during the guilt phase.

### a. Failure to pursue an insanity defense

Mr. Hooks argues that counsel was deficient for failing to investigate and pursue an insanity defense. In his view, such a defense, even if ultimately unsuccessful, would have opened the door to expert testimony on his mental state, which in turn would have helped establish that he had killed in the heat of passion rather than with malice aforethought. In particular, according to Mr. Hooks, his counsel was ineffective because he misunderstood the legal standard for insanity.

Prior to trial, Mr. Hooks's attorney, Ron Evans, requested a competency evaluation for Mr. Hooks. Mr. Hooks was examined by Dr. Edith King and declared

-76-

competent. Thereafter, Mr. Evans retained Dr. King and the aforementioned Dr. Murphy to assist him at trial. In light of the fact that Mr. Hooks had unquestionably killed Ms. Blaine, Mr. Evans's strategy was to attempt to negate the intent-to-kill element of the first-degree murder charge. *See* Fed. Evid. Hr'g Tr. at 206. To that end, he put on three witnesses at trial: Scott Cannon, a police officer, to testify about a statement by Mr. Hooks six days after the murder that he "didn't mean to kill her [i.e., Ms. Blaine]," 3 Trial Tr. at 440 (internal quotation marks omitted); and Drs. King and Murphy, to establish through expert testimony that Mr. Hooks had committed the murder in the heat of passion or with a depraved mind, rather than with malice aforethought.

All such testimony was ultimately excluded, however. The State objected to Officer Cannon's testimony on the ground that Mr. Hooks's statement ("I didn't mean to kill her") was self-serving hearsay, and the trial court sustained the objection. *See id.* at 442–43. When Mr. Evans began direct examination of Dr. Murphy, the State objected to his testimony, as well as to the proposed testimony of Dr. King, on the ground that it would invade the province of the jury. *See id.* at 447–56, 473–74. The trial court sustained those objections, too. *See id.* at 456, 474. The court recognized that psychiatric testimony was permissible to help establish a defendant's insanity, but because an insanity defense was not being pursued, Mr. Hooks's state of mind was "a question of fact peculiarly left within the exclusive province of the jury." *Id.* at 455.

Mr. Hooks vigorously argues that the information available to Mr. Evans should have prompted a reasonable attorney to pursue an insanity defense and that he was

prejudiced by Mr. Evans's failure to do so because, even if he did not prevail on his insanity defense, "[t]here is a reasonable probability the insanity evidence would have eliminated an intent finding, the essential requisite for a first degree murder conviction." Aplt. Opening Br. at 81. Indeed, there was no dispute that Mr. Hooks killed Ms. Blaine; the salient question was whether he acted with the requisite intent to constitute first-degree murder. *See Hooks v. Ward*, 184 F.3d at 1231 (separate opinion of Ebel, J.) ("From the outset of trial Hooks admitted that he caused Shalimein's death, and sought only to challenge the state's assertion that he did so intentionally.").

We conclude, however, that Mr. Hooks cannot prevail on this claim of error. Mr. Evans had considered presenting an insanity defense but opted not to because, as he would later explain at the federal evidentiary hearing, he "didn't think that there was a factual basis for it." Fed. Evid. Hr'g Tr. at 173 (Test. of Mr. Evans). Oklahoma follows the M'Naghten rule, under which "[t]he defendant must demonstrate at trial that *during the commission of the crime* he was suffering from a mental disease or defect rendering him unable to differentiate between right and wrong, *or* unable to understand the nature and consequences of his acts." *Jones v. State*, 648 P.2d 1251, 1254 (Okla. Crim. App. 1982) (emphases added). As a leading commentator helpfully observes:

> The M'Naghten test consists of two elements which logically can be separated. The first portion [concerning an inability to understand the nature and consequences of one's actions] relates to an accused who is psychotic to an extreme degree. It assumes an accused who, because of mental disease, did not know the nature and quality of his act; he simply did not know what he was doing. For example, in crushing the skull of a human being with an iron bar, he believed that he was

-78-

smashing a glass jar. The latter portion of M'Naghten [involving an inability to differentiate between right or wrong] relates to an accused who knew the nature and quality of his act. He knew what he was doing; he knew that he was crushing the skull of a human being with an iron bar. However, because of mental disease, he did not know that what he was doing was wrong. He believed, for example, that he was carrying out a command from God.

2 Charles E. Torcia, *Wharton's Criminal Law* § 101, at 12–17 (15th ed. 1994) (footnotes omitted); *see also* 22 C.J.S. *Criminal Law* § 99, at 128 (1989) (noting that under the M'Naghten test "there exist two distinct and independent bases upon which a verdict of not guilty by reason of insanity might be returned").[25] Under Oklahoma law, "a defendant is presumed to be sane and the burden is upon him to produce sufficient evidence to raise a reasonable doubt as to his sanity." *Wooldridge v. State*, 801 P.2d 729, 733 (Okla. Crim. App. 1990); *accord Garrett v. State*, 586 P.2d 754, 755 (Okla. Crim. App. 1978).

Ordinarily, we indulge a "'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' and that 'the challenged action might be considered sound trial strategy.'" *Fairchild*, 579 F.3d at 1140 (quoting *Strickland*, 466 U.S. at 689). As it relates to the portion of the M'Naghten rule involving an alleged inability to know right from wrong, we conclude on this record that Mr. Evans

---

[25]     The first portion of the M'Naghten rule discussed in the quoted passage above customarily is stated using the phrase "nature and quality," when referring to a defendant's understanding of his actions, whereas Oklahoma uses the phrase "nature and consequences." However, the term "quality" and "consequences" are apparently intended to embrace the same concept, focusing on a defendant's comprehension of the "harmfulness" of his actions. 22 C.J.S. *Criminal Law* § 103, at 134.

reasonably could have concluded that he did not have the evidence to satisfy his burden.

First, Mr. Hooks's initial lies to cover up the murder, his attempt to hide evidence, and his seeking medical attention for Ms. Blaine indicate that he knew right from wrong.[26] *Cf. Garrett*, 586 P.2d at 756 ("The evidence that the defendant looked 'wild' or 'berserk' or her own testimony of loss of memory is not evidence that brings the defendant within the above rule to show that she did not know right from wrong."). Second, Mr. Evans unquestionably would have been aware that there would be evidence introduced in the trial that, prior to the murder of Ms. Blaine, Mr. Hooks had not infrequently beaten her (sometimes viciously). *See* 2 Trial Tr. at 417, 420 (Test. of Ms. Dinh). Such evidence could have cast doubt on an assertion that, at the time that he killed Ms. Blaine, Mr. Hooks did not know right from wrong. *See Kobyluk v. State*, 231 P.2d 388, 393 (Okla. Crim. App. 1951) ("We think that evidence of the actions, conduct, and general demeanor of defendant toward his wife, showing a continuous course of abuse from 1945 until the date of the alleged assault in 1948, was competent as tending to show the state of mind of defendant at the time of the assault. It should be borne in mind that the only issue in this case was the question as to whether defendant knew right from wrong at the time of the shooting . . . ." (citations omitted)). Third, nothing in Mr.

---

[26]     Mr. Hooks disputes this, pointing out that insanity is judged at the time that one commits an offense, not afterwards. However, the actions one takes immediately after committing a crime are surely probative of one's legal sanity at the time of the act. *See Frederick v. State*, 37 P.3d 908, 945 (Okla. Crim. App. 2001) (relying in part on the fact that the defendant had attempted to conceal his crime to conclude that the defense of insanity was unsupported by the evidence).

Evans's interaction with Mr. Hooks or in the experts' reports gave him any other reason to believe that an insanity defense (on the right-from-wrong ground) would be successful. *See* Fed. Evid. Hr'g Tr. at 208–09 (Test. of Mr. Evans). Finally, an insanity defense would have allowed the State to put on its own experts, and as Mr. Evans was aware, the mental-state evidence was not a slam-dunk for Mr. Hooks. *See id.* (discussing Dr. King's report, which detailed Mr. Hooks's ability to understand and communicate, and admitting that it was "not good evidence for an insanity defense"); *see also Hooks Habeas I*, slip op. at 6–8. For these reasons, we cannot conclude that Mr. Evans rendered constitutionally deficient representation in electing not to pursue such a defense.

However, with respect to M'Naghten's second theory, the picture is more complicated. Mr. Evans was apparently unaware of this theory. At the federal evidentiary hearing, he described the M'Naghten rule as "basically not knowing the difference between right and wrong." Fed. Evid. Hr'g Tr. at 173 (Test. of Mr. Evans). It was pointed out to him that the definition is disjunctive and also includes an inability to understand the nature and consequences of one's actions, to which he responded, "I think that goes hand-in-hand with not knowing right from wrong." *Id.* When his understanding was corrected, he admitted, "I guess I was wrong." *Id.* at 174.

The ordinary presumption discussed above—that an attorney's conduct falls within the wide range of reasonable professional assistance and that his conduct might be deemed sound trial strategy—dissipates when an attorney has a "demonstrated ignorance of law directly relevant to a decision." *Bullock v. Carver*, 297 F.3d 1036, 1049 (10th Cir.

-81-

2002). Counsel's mistake of law will often, though not always, mean that "counsel performed in an objectively deficient manner." *Id.* at 1050.

Nonetheless, we need not opine on Mr. Evans's performance with regard to his failure to advance M'Naghten's nature-and-consequences insanity theory. Even if we were to conclude that, because of his apparent lack of knowledge of this M'Naghten theory, Mr. Evans could not have made a reasonable decision not to pursue it, and thus his representation in this regard was constitutionally deficient, we would determine under *Strickland*'s second prong that Mr. Hooks did not suffer any prejudice from this deficient representation.

Giving appropriate consideration to the OCCA's findings, the record would not have supported a jury verdict of insanity under the M'Naghten's nature-and-consequences theory (which was apparently beyond Mr. Evans's ken). In support of his claim, Mr. Hooks relies heavily on the testimony of Dr. Murphy. Among other things, Dr. Murphy apparently was prepared to testify that Mr. Hooks was "suffering from a severe chronic psychosis, which has a recurrent and episodic nature," 3 Trial Tr. at 459, and that when he killed Ms. Blaine, "[h]e acted in the heat of passion in a delusional state," *id.* at 463. However, in upholding the trial court's exclusion of the guilt-stage testimony of Dr. Murphy, as well as Dr. King, the OCCA found:

> Both doctors' testimony significantly omitted an assessment of Hooks' sanity, i.e., whether, at the time of the murder, he had the mental capacity to distinguish right from wrong or to understand the nature and consequences of his acts. Dr. Murphy testified Hooks was probably not in touch with reality when he murdered Ms. Blaine, but did not say

-82-

whether Hooks could have distinguished right from wrong or appreciated the nature and consequences of his acts. Dr. King testified Hooks has a "tendency not to pay attention to consequences but just impulsively to act." Choosing to ignore consequences is clearly different from being incapable of understanding those consequences.

*Hooks v. State*, 862 P.2d at 1278 (citation omitted).

These factual findings of the OCCA are entitled to a presumption of correctness, rebuttable only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Hooks v. Ward*, 184 F.3d at 1223. Mr. Hooks has failed to rebut that presumption. Consequently, we cannot conclude that a rational factfinder could have determined that Mr. Hooks suffered from such an extreme form of psychosis that he was unaware of the nature and consequences of his actions, as contemplated by the M'Naghten rule. Indeed, although opining that Mr. Hooks was delusional when he beat Ms. Blaine to death, Dr. Murphy never asserted that, because of mental illness, Mr. Hooks actually thought he was inflicting his lethal blows on anyone—or anything—other than Ms. Blaine.

With an insufficient factual foundation under M'Naghten's nature-and-consequences theory, Mr. Hooks would not have been allowed to place "insanity evidence," Aplt. Opening Br. at 81, supportive of this theory before the jury. Nor could a rational trier of fact possibly have concluded under this theory that Mr. Hooks was insane. Thus, even if Mr. Evans's ignorance of the second half of the M'Naghten rule rendered his representation objectively unreasonable, Mr. Hooks has failed to establish that he was prejudiced.

-83-

### b. Failure to secure Carol Hill as a witness

Mr. Hooks also alleges that his attorney was deficient for failing to secure Carol Hill as a witness. According to Mr. Hooks, Ms. Hill was a friend of his who would have testified favorably for him and undermined the damaging testimony of Shanna Dinh, one of the witnesses for the prosecution. Mr. Evans spoke with Ms. Hill on several occasions prior to trial and took detailed notes of their conversations. *See* Fed. Evid. Hr'g Tr. at 180–87 (Test. of Mr. Evans). Mr. Evans thought Ms. Hill was "very interested in his case," and he expected her to testify. *Id.* at 187 ("She never expressed an unwillingness to come to court, to my memory."). But when the time came, Ms. Hill did not appear. Mr. Evans "was surprised when she didn't show up" and concedes he "should have subpoenaed her." *Id.*

The district court found that Mr. Evans's failure to subpoena Ms. Hill "was not professionally unreasonable" because "[t]here is no evidence that Evans knew, or should have known, that Hill would not be available to testify at the trial." *Hooks Habeas I*, slip op. at 9. However, we plant our conclusion on different ground and hold that Mr. Hooks was not prejudiced by Ms. Hill's absence.

When counsel's failure to call or subpoena a witness can be traced to a reasoned strategic judgment, we generally find counsel's performance reasonable under the first prong of *Strickland. See, e.g.*, *Bunton v. Atherton*, 613 F.3d 973, 982–83 (10th Cir. 2010); *Parker v. Scott*, 394 F.3d 1302, 1323 (10th Cir. 2005). On the other hand, when

-84-

neglect or an incomplete investigation accounts for the failure to secure a witness, counsel's performance is more likely unreasonable, and the inquiry often turns to prejudice. That analysis is inherently fact-dependent and must take in the totality of evidence adduced at trial. *See Welch*, 639 F.3d at 1015.

In *Snow v. Sirmons*, for example, we held that it was unreasonable for counsel to fail to call three witness, all of whom would have testified that a certain Mr. Allen, rather than the defendant, committed the murder in question. 474 F.3d 693, 729 (10th Cir. 2007). But the failure was not prejudicial because the witnesses' testimony could have been admitted only to impeach Mr. Allen's own testimony, not as substantive evidence, and in light of other evidence at trial—particularly the defendant's "own confused and wavering testimony"—a different outcome was not reasonably probable. *Id.* at 730. In a similar vein, in *Lucero v. Kerby*, 133 F.3d 1299, 1323 (10th Cir. 1998), while not reaching the question of counsel's performance, we held that the failure to subpoena a witness for trial was not prejudicial. There was no showing that the witness was a key witness "based on some meaningful connection between [the witness] and the crimes for which [the defendant] was convicted," and the witness's putative testimony would not have "significantly furthered" the defense's theory. *Id.*

When a witness is "crucial" to the defense, failure to secure that witness is often both unreasonable and prejudicial. This is especially true when the witness is an alibi witness or a disinterested bystander with exculpatory information, or when the

government's case rests primarily on eyewitness testimony that would have been directly refuted by the witness's own testimony. *See Hodgson v. Warren*, 622 F.3d 591, 600–01 (6th Cir. 2010); *Adams v. Bertrand*, 453 F.3d 428, 437–38 (7th Cir. 2006); *Goodman v. Bertrand*, 467 F.3d 1022, 1030–31 (7th Cir. 2006); *United States v. Andrews*, 953 F.2d 1312, 1327 (11th Cir. 1992); *Coleman v. Brown*, 802 F.2d 1227, 1233–34 (10th Cir. 1986).

Based on our review of the record, we do not believe that Ms. Hill was a crucial witness or that there is a reasonable probability that her testimony would have altered the outcome of the trial. Although Mr. Hooks argues that her testimony would have "completely undermined" the testimony of Shanna Dinh, Aplt. Opening Br. at 83, we disagree. Admittedly, Ms. Dinh's testimony on behalf of the prosecution was damaging to Mr. Hooks. She testified that she had a child with him, prostituted for him, turned over her welfare checks to him, and received beatings from him (one of which caused her to have a miscarriage). *See* 2 Trial Tr. at 410–15 (Test. of Ms. Dinh). She also testified that Mr. Hooks beat Ms. Blaine and did not want her to have his child. *See id.* at 416–20. In the main, this testimony concerned Ms. Dinh's personal interactions with Mr. Hooks and her personal observations of his relationship with Ms. Blaine.

Ms. Dinh mentioned Ms. Hill a few times in her testimony. According to Ms. Dinh, Ms. Hill was one of Mr. Hooks's girlfriends and prostituted for him, *id.* at 416–17, and also received beatings from him, *id.* at 417. By contrast, Ms. Hill apparently would

have testified that she had a good relationship with Mr. Hooks, was not one of his girlfriends, did not receive beatings from him, and never saw him act violently toward Ms. Blaine. *See* Fed. Evid. Hr'g Tr. at 182, 184–85 (Test. of Mr. Evans). She also would have told the jury that Ms. Dinh was "a dirty little girl" and "want[ed] revenge on Victor." *Id.* at 181–82 (internal quotation marks omitted).

Based upon this evidence, we would be hard-pressed to conclude that Ms. Hill would have undermined Ms. Dinh's testimony and credibility in anything but minor ways. The controverted points of Ms. Dinh's testimony were isolated ones. Nothing about Ms. Hill's putative testimony would have undercut the most damaging information that Ms. Dinh relayed to the jury: her own violent and twisted relationship with Mr. Hooks. And, although Ms. Hill would have told the jury that she never saw Mr. Hooks beat his wife, the potency of that testimony would have been diminished by the circumstances of the crime in this case. Because Ms. Hill's testimony would have been of limited utility, Mr. Evans's failure to subpoena her to testify, even if professionally unreasonable, was not prejudicial.

We therefore affirm the district court's denial of habeas relief as to Mr. Hooks's conviction.[27]

---

[27] Mr. Hooks does not articulate a separate cumulative-prejudice claim with respect to the alleged errors of trial counsel during the guilt phase. Cumulative error is a substantive claim just like any other and must be affirmatively raised by a party. *See Smith*, 534 F.3d at 1217. We therefore do not consider cumulative prejudice here. Even if we did, it would not change our conclusion.

## 2. Counsel's Performance During the Sentencing Phase

While we entertain "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Matthews*, 577 F.3d at 1190 (quoting *Strickland*, 466 U.S. at 689), we nevertheless apply "closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case," *Cooks*, 165 F.3d at 1294; *see also Osborn v. Shillinger*, 861 F.2d 612, 626 n.12 (10th Cir. 1988) ("[T]he minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death, justify a court's closer scrutiny of attorney performance at the sentencing phase."). We judge counsel's performance by reference to "prevailing professional norms," which in capital cases include the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). *Young v. Sirmons*, 551 F.3d 942, 957 (10th Cir. 2008) (citing *Wiggins*, 539 U.S. at 523). "Among the topics defense counsel should investigate and consider presenting include medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experiences, and religious and cultural influences." *Id.*

Counsel has a duty to conduct a "thorough investigation—in particular, of mental health evidence—in preparation for the sentencing phase of a capital trial." *Wilson*, 536 F.3d at 1083. We recently had occasion to expound on this principle, drawing on a trilogy of Supreme Court cases—*Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v.*

*Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005)—involving ineffective assistance at capital-sentencing proceedings. Surveying those cases, we divined "three important principles":

> First, the question is not whether counsel did *something*; counsel must conduct a full investigation and pursue reasonable leads when they become evident. Second, to determine what is reasonable investigation, courts must look first to the ABA guidelines, which serve as reference points for what is acceptable preparation for the mitigation phase of a capital case. Finally, because of the crucial mitigating role that evidence of a poor upbringing or mental health problems can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence. Our own Circuit has emphasized this guiding principle. In *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004), we held that it was "patently unreasonable" for trial counsel to fail to present evidence of Smith's borderline mental retardation, brain damage, and troubled childhood, and stated that this type of mitigating evidence "is exactly the sort of evidence that garners the most sympathy from jurors."

*Wilson*, 536 F.3d at 1084–85 (citations omitted).

If we find that counsel's performance at sentencing was deficient, we must then analyze the prejudicial effect on Mr. Hooks's defense. Prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. To assess prejudice arising out of counsel's errors at a capital-sentencing proceeding, we must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Young*, 551 F.3d at 960 (quoting *Wiggins*, 539 U.S. at 534) (internal quotation marks omitted). If "there is a reasonable probability that at least one juror would have struck a different balance,"

-89-

*Wiggins*, 539 U.S. at 537—*viz.*, that "at least one juror would have refused to impose the death penalty," *Wilson*, 536 F.3d at 1124 (Hartz, J., concurring)—prejudice is shown.

Based on these principles, we find that counsel's performance during the sentencing phase was woefully inadequate. Not only did he mount "an extraordinarily limited case in mitigation," *Anderson v. Sirmons*, 476 F.3d 1131, 1146 (10th Cir. 2007), but his own statements and the statements of his testifying expert served to villify Mr. Hooks in the eyes of the jury. These failures raise a reasonable probability "that at least one juror would have empathized with Mr. [Hooks]" and chosen life over death. *Wilson*, 536 F.3d at 1095.

### a. Counsel's mitigation case

The sentencing phase was brief. It began shortly after the guilt phase had concluded. The State sought the death penalty, positing three aggravating circumstances: (1) Mr. Hooks's previous conviction for a felony involving the use or threat of violence, (2) the "especially heinous, atrocious or cruel" nature of the murder, and (3) the probability that Mr. Hooks constituted a continuing threat to society. 3 Trial Tr. at 501–02. The State successfully moved to incorporate all evidence presented during the guilt phase. *Id.* at 509. In addition, it called a single witness, Idabel, Oklahoma police officer Buck Ray, who testified that Mr. Hooks had been convicted on a charge of armed robbery of a liquor store in 1982. *Id.* at 507 (Test. of Mr. Ray). His testimony suggested that in the course of the robbery, Mr. Hooks had cut the store clerk's hand with a knife.

*See id.* at 508. The State then rested. *Id.* at 509.

Mr. Evans then called three witnesses: Mr. Hooks's sister, Vargus Hooks; his mother, Clara Hooks; and Dr. Murphy. Vargus Hooks's testimony fills little more than a page of the trial transcript. *See id.* at 511–12 (Test. of Vargus Hooks). After preliminaries, Mr. Evans asked Vargus just four questions: whether she would stay in contact with Mr. Hooks if the jury spared his life, whether she would visit him in prison, whether she and Mr. Hooks were close growing up, and whether she had stayed in touch with Victor over the past few years. *Id.* She answered affirmatively to all four questions then stepped down. *Id.*

Clara Hooks's testimony was only slightly less brief. *See id.* at 512–14 (Test. of Clara Hooks). Mr. Evans asked her about a car accident in which Mr. Hooks was involved when he was younger. *Id.* at 512. Clara stated that an eighteen-wheeler had hit her son and "caused quite a bit of damage to" him. *Id.* He had nightmares, trouble sleeping, and headaches as a result. *Id.* at 513. Mr. Evans then asked a few questions about the relationship between Mr. Hooks and Ms. Blaine. *Id.* Clara testified that her son and Ms. Blaine loved each other, that they frequently came to visit her, and that she (Clara) desired a relationship with their infant daughter. *Id.* Finally, Mr. Evans asked whether Clara would stay in touch with Mr. Hooks if the jury spared his life. *Id.* at 514. She said she would do so "constantly," then stepped down. *Id.*

Finally, Mr. Evans called Dr. Murphy, who testified about psychological

-91-

examinations of Mr. Hooks that he had administered. Dr. Murphy opined that Mr. Hooks suffered "from a chronic form of psychosis, where he's going to have recurrent repeated episodic breaks with his ability to tell reality from fantasy." *Id.* at 518 (Test. of Dr. Murphy). He described Mr. Hooks as "violent," *id.* at 522, and "crazy," *id.* at 519, 530, and said he occasionally exhibited a "crazy grin" or "smirk" characteristic of psychotic patients, *id.* at 523. Dr. Murphy also detailed a number of psychotic and delusional symptoms that Mr. Hooks exhibited while spending time at a mental health facility in 1981 and 1982. *Id.* at 522–26. Dr. Murphy noted that these past mental-health problems were consistent with his own evaluation. *Id.* at 526–29. At the end of his testimony, Dr. Murphy opined that, given his diagnosis of chronic psychosis and Mr. Hooks's detachment from reality, it was "difficult to imagine" that Mr. Hooks could, "in a fully rational, cold-blooded, premeditated fashion, . . . have a plan to murder." *Id.* at 529. On cross-examination, Dr. Murphy admitted that he had not read the police reports pertaining to Ms. Blaine's murder, had not listened to Mr. Hooks's tape-recorded confession, and had not seen any of the photographs in the case that depicted Ms. Blaine after her death. *Id.* at 531. He stated only that the photographs had been orally described to him by Mr. Evans. *Id.*

Following Dr. Murphy's testimony, the defense rested its mitigation case. *See id.* at 536.

### b. Counsel's failures

Mr. Evans's mitigation case failed to meet the standards we have set out for counsel in capital-sentencing proceedings. Indeed, the presentation was sub-par in almost every relevant respect. Evidence of family and social history was sorely lacking; the mental-health evidence presented was inadequate and quite unsympathetic; and Mr. Evans not only failed to rebut the prosecution's case in aggravation but actually bolstered it by his own statements.

*Family and social history*. The testimony by Mr. Hooks's family members was perfunctory, to put it mildly. Mr. Evans made no attempt to educate the jury, through the testimony of Clara and Vargus Hooks, on Mr. Hooks's life circumstances and his tragic, chaotic upbringing. Even the most minimal investigation would have uncovered a life story worth telling: a premature birth, an openly abusive father, frequent moves, educational handicaps, and personal family tragedies.[28] We have previously recognized

---

[28]    Mr. Hooks was born premature and spent his first three months in a hospital. Fed. Evid. Hr'g at 10 (Test. of Clara Hooks). His childhood was traumatic and chaotic. His father was physically abusive toward both him and his mother, prone to binge-drinking, and often hauled away by police after abusive episodes. *Id.* at 11–15; *id.* at 45–46 (Test. of Victor Hooks). As a result of the abuse, Clara left her husband a number of times and moved to California, only to return home later. *See id.* at 16. She would take the children with her on these often unplanned moves, forcing Mr. Hooks and his siblings to withdraw from school. *See id.* at 16, 21.

Mr. Hooks's life was also shaped by personal tragedy. When he was a young teenager, his brother Michael, with whom he was close, was killed in a motorcycle accident. *Id.* at 9, 47–48. A few years later, Mr. Hooks and his father were in a severe car accident with an eighteen-wheeler. *Id.* at 28, 50–51. Mr. Hooks almost went through

(continued...)

that "this type of evidence 'is exactly the sort of evidence that garners the most sympathy from jurors.'" *Anderson*, 476 F.3d at 1147 (quoting *Smith*, 379 F.3d at 942). The information was readily available from Clara and Vargus, but Mr. Evans neglected even to ask. *See id.* at 1145 (finding counsel deficient for failing to investigate and present defendant's family background at a capital sentencing proceeding).

*Mental-health evidence*. While Dr. Murphy's testimony may have helped the jury see that Mr. Hooks suffered from mental problems, it was troubling in a number of respects. First, throughout the testimony, Mr. Evans made little effort to connect Dr. Murphy's diagnosis to the circumstances of the crime. The importance of counsel's role in this regard cannot be overstated, as we have repeatedly recognized. Counsel in capital cases must explain to the jury why a defendant may have acted as he did—must connect the dots between, on the one hand, a defendant's mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question. *See Fairchild*, 579 F.3d at 1150–51; *Anderson*, 476 F.3d at 1148; *Smith*, 379 F.3d at 943.

---

[28](...continued)
the front window and suffered a head injury. *Id.* Thereafter, he was unable to play sports and began to experience headaches, nightmares, and trouble sleeping. *Id.* Tragedy struck again in 1978 when his father died in a car accident. *Id.* at 16–17. A year later, Mr. Hooks saw his brother Evan come home, covered in blood, and pass out. *Id.* at 18–20. He had been shot, and both Mr. Hooks and his mother (mistakenly) thought Evan was dead. *Id.* at 19. At the federal evidentiary hearing, Clara described Mr. Hooks's fear and panic as he pleaded with a comatose Evan to "please wake up." *Id.* at 19 (internal quotation marks omitted). Thereafter, Mr. Hooks's mental and emotional problems continued, and he suffered from depression. *Id.* at 21–22. Clara took him to see a psychiatrist, and he was later hospitalized. *Id.*

Here, in listening to Dr. Murphy, the jury was left with almost no explanation of how Mr. Hooks's mental problems played into the murder of Ms. Blaine (both the fatal beating he administered, and his apparent remorse and attempt to secure help immediately thereafter).

Absent this explanation, Dr. Murphy's testimony at several points actually worked in the State's favor. *See Anderson*, 476 F.3d at 1146–47 (noting that "the case in mitigation presented by trial counsel played into the prosecution's theory"). He repeatedly referred to Mr. Hooks as "violent," *see* 3 Trial Tr. at 522 (Test. of Dr. Murphy)—even once as "very, very violent," *id.*—and "crazy," *id.* at 519, 523, 530. True, Dr. Murphy did opine at one point that Mr. Hooks could not have committed "cold-blooded, premeditated" murder. *See Williams*, 529 U.S. at 398 (emphasizing the importance of mental-health evidence showing that "violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation"). But that aspect of his testimony was significantly undermined when the jury learned, on cross-examination, that Dr. Murphy knew almost nothing about Mr. Hooks's case—that he had not read the police reports, had not listened to Mr. Hooks's confession, and had not seen the photographs. *See* 3 Trial Tr. at 531. Mr. Evans totally failed to prepare his witness, thus strongly diminishing the potential mitigating impact of the testimony.

Further investigation into readily available evidence also would have revealed that the mental-health problems were enduring. Since childhood, Mr. Hooks had struggled in

-95-

school, was frequently evaluated for mental retardation, and was placed in special-education classes. Fed. Evid. Hr'g Tr. at 20–21 (Test. of Clara Hooks), 49 (Test. of Victor Hooks). While he may not meet the legal definition of mentally retarded under Oklahoma law, no one disputes that by the time of trial he had been clinically diagnosed with mild or borderline mental retardation. *See Hooks Atkins Appeal*, 126 P.3d at 640–41. Evidence of Mr. Hooks's educational handicaps was surely relevant to the jury's appraisal. It was readily available and should have been part of Mr. Evans's mitigation case. *See Anderson*, 476 F.3d at 1143.

Even more importantly, Mr. Hooks's premature birth, the head injury he suffered in an eighteen-wheeler accident, and the problems he experienced thereafter were clear markers for organic brain damage. *See Alverson*, 595 F.3d at 1162 (noting that "severe head trauma and/or sudden changes in behavior after such trauma" may point to the existence of organic brain damage). Five years after conviction and sentencing, Dr. Gelbort diagnosed Mr. Hooks with diffuse organic brain damage and testified at the 1997 federal evidentiary hearing that Mr. Hooks has damage to his frontal lobes, the "gas pedal and the brake pedal of behavior." Fed. Evid. Hr'g Tr. at 101 (Test. of Dr. Gelbort). Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect. *See Rompilla*, 545 U.S. at 392; *Wilson*, 536 F.3d at 1094; *Smith*, 379 F.3d at 942–43. "Diagnoses of specific mental illnesses . . . , which are associated with abnormalities of the brain and can be treated with appropriate medication, are likely to [be] regarded by a jury as more

mitigating than generalized personality disorders . . . ." *Wilson*, 536 F.3d at 1094. And for good reason—the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action. *See Bryan v. Mullin*, 335 F.3d at 1244 (Henry, J., concurring in part and dissenting in part) ("[Counsel's] performance left the jury no reason even to consider as a possibility that [the defendant] might not be morally culpable enough, as the result of his involuntarily adduced organic brain disorder, for the death penalty."); *see also Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002) ("By explaining that [defendant's] behavior was physically compelled, not premeditated, or even due to a lack of emotional control, his moral culpability would have been reduced."); *cf. Wilson*, 536 F.3d at 1093 ("[D]efendants who commit criminal acts that are attributable to . . . emotional or mental problems, may be less culpable than defendants who have no such excuse." (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)) (internal quotation marks omitted)). Neither Mr. Evans nor Dr. Murphy looked into the possibility of organic brain damage. Had they done so, as Dr. Gelbort did, Mr. Evans could have sketched a more sympathetic figure of Mr. Hooks, one less deserving of death.

*Responding to the prosecution's case in aggravation*. The State called Officer Ray to testify as to Mr. Hooks's prior armed-robbery conviction, one of three aggravating circumstances presented by the prosecution. Even a cursory investigation into the circumstances surrounding this crime would have revealed a much less sordid tale than

the one suggested in Officer Ray's testimony. At a liquor store in 1982, Mr. Hooks took $35 from a cash drawer and returned home with it, along with a sack containing a handgun. Fed. Evid. Hr'g Tr. at 32–33 (Test. of Clara Hooks).[29] He immediately told his mother what he had done. *Id.* at 33. Clara Hooks took the gun and marched her son straight to the police station to speak with the chief of police about what happened. *Id.* This information would have been important to a jury. Although it would not have entirely negated the violent-felony aggravator, it certainly would have softened its edge. Mr. Evans did not cross-examine Officer Ray on these surrounding circumstances (indeed, did not cross-examine him at all), nor did he ask Clara to explain them when she was on the witness stand. "[I]t is difficult to see how counsel could have failed to realize that without examining th[is] readily available [information, he was] seriously compromising [his] opportunity to respond to a case for aggravation." *Rompilla*, 545 U.S. at 385.[30]

---

[29] On the record before us, it is not clear where the handgun came from. Clara Hooks testified that the handgun was under the cashier's counter and that Mr. Hooks grabbed it when he swiped the $35. Fed. Evid. Hr'g Tr. at 32 (Test. of Clara Hooks). The State calls this "not credible," although it offers no alternative explanation. Aplee. Br. at 80. This dispute has no bearing on our analysis. There is also a dispute about the source of the cut on the cashier's hand in connection with the robbery. At trial, Officer Ray offered an elliptical account of the events, saying only that he saw the cashier's cut and the knife blade lying on the floor. 3 Trial Tr. at 508 (Test. of Mr. Ray). Mr. Hooks suggests that the knife was "laying on the counter" and the cut was an accident. Aplt. Opening Br. at 94. The State calls this "highly improbable." Aplee. Br. at 80. Again, this dispute has no bearing on our analysis.

[30] The State suggests that Mr. Hooks's confession to his mother would have been inadmissible hearsay at the sentencing proceeding under Okla. Stat. tit. 12,

(continued...)

For his part, Mr. Evans bolstered the prosecution's case in aggravation by effectively conceding the continuing-threat aggravator in his opening statement. As he prepared the jury to hear from Dr. Murphy, Mr. Evans noted:

> Some of the things that Dr. Murphy will tell you will scare you about Victor, in all honesty. Some of the things that Victor will tell you will indicate to you that he's a continuing threat to society. . . . Some of the things that Dr. Murphy will tell you will indicate that Victor is a continuing threat to society, which is one of the allegations against him.

3 Trial Tr. at 504–05. Subsequently, not only would the jury hear of Mr. Hooks's armed-robbery conviction, unaccompanied by any description of its mitigating context; it would also hear from Dr. Murphy that Mr. Hooks was both "crazy" and "very, very violent." *Id.* at 522, 530 (Test. of Dr. Murphy). We recognize that conceding a continuing-threat aggravator is not necessarily deficient performance and may even help build credibility with the jury. *See Hooker v. Mullin*, 293 F.3d 1232, 1246–47 (10th Cir. 2002). But it is particularly unreasonable when, as here, counsel presents a beggarly mitigation case and, worse, reinforces the conceded aggravator both by failing to challenge the government's

---

[30](...continued)
§§ 2801–2802. Section 2802 makes hearsay—an out-of-court statement "offered in evidence to prove the truth of the matter asserted," *id.* § 2801(A)(3)—generally inadmissible, *id.* § 2802. We think Clara Hooks's testimony as to her son's confession would have been admissible non-hearsay on *at least* two bases. First, it would have been admissible for the *fact* of confession, regardless of the truth or falsity of its constituent statements, in order to show Mr. Hooks's remorse and to humanize him to the jury. Second, it would have been admissible to explain Clara's reaction to the events, specifically her marching her son up to the Idabel police station to tell the chief of police what happened. *See Dodd v. State*, 100 P.3d 1017, 1034–35 (Okla. Crim. App. 2004); *Smallwood v. State*, 907 P.2d 217, 226–27 (Okla. Crim. App. 1995).

case in aggravation (impeachable though it was) and by characterizing the mitigation evidence, as well as his client, as "scar[y]."

*Conclusion*. With so much mitigating evidence available and so little of it unearthed by counsel, we are compelled to conclude that Mr. Hooks was denied constitutionally effective assistance of counsel and, thus, a fair sentencing. Counsel did not undertake the reasonable investigation that our decisions require. *See Wilson*, 536 F.3d at 1084. He presented almost no family-history evidence, and the mental-health evidence that was presented was inadequate, unsympathetic, and even counterproductive at times. This evidence was reasonably available to Mr. Evans and "highly relevant to the question of moral culpability," *Anderson*, 476 F.3d at 1147, and its absence "left the jury with a 'pitifully incomplete' picture" of Mr. Hooks, *id.* at 1148 (quoting *Smith*, 379 F.3d at 944). As the Supreme Court and we have repeatedly found, the failure to investigate and develop this kind of evidence at sentencing constitutes deficient performance.[31]

These deficiencies were only punctuated by counsel's failure to respond to the State's case in aggravation. The State was able to present Mr. Hooks's armed-robbery

---

[31]    We recently reached a contrary conclusion in *DeRosa v. Workman*, 679 F.3d 1196, 1211–21 (10th Cir. 2012), where the defense put on a much more extensive mitigation case, including evidence of petitioner's alleged organic brain damage and his troubled and dysfunctional upbringing and family dynamics. We held that additional mitigating evidence that petitioner alleged should have been introduced by trial counsel was, "in large part, duplicative of the evidence actually presented by [petitioner's] trial counsel." *Id.* at 1218. Even a cursory survey of the mitigation case in *DeRosa* underscores the woeful inadequacy of the mitigation case put on here by Mr. Hooks's counsel.

conviction as evidence of his dangerousness and tendency toward violence, but the jury never heard the rest of the story from Clara Hooks. Further, counsel's effective concession that Mr. Hooks was a "continuing threat to society" was not grounded in any strategic calculus and was particularly damaging in light of the otherwise paltry mitigation case.

We conclude, moreover, that counsel's unreasonable performance prejudiced Mr. Hooks within the meaning of *Strickland*. "There is no doubt that the . . . murder[] in this case w[as] callous and brutal." *Id.* at 1146. But in his painfully brief case for mitigation, Mr. Evans missed the opportunity to "humanize and explain," to "individualize," Mr. Hooks to the jury. *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2001) (quoting *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000)) (internal quotation marks omitted). The jury "never received an explanation for [Mr. Hooks's] behavior." *Smith*, 379 F.3d at 943. It heard precious little about his family and educational background, and the mental-health evidence that was presented was either counterproductive or of little mitigating value. As a result, jurors faced with an especially brutal crime were left with almost nothing to weigh in the balance. A proper presentation of the family-history and mental-health evidence, not to mention the circumstances surrounding Mr. Hooks's armed-robbery conviction, would have been "powerful mitigation." *Wilson*, 536 F.3d at 1093. "Had the jury been able to place" this evidence "on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. Accordingly, we find that counsel rendered

-101-

deficient, prejudicial performance and denied Mr. Hooks the "fundamental right to a fair trial" that the Sixth Amendment assures. *Strickland*, 466 U.S. at 684.

### III. Conclusion

The statutory basis for the federal courts' authority to grant the writ of habeas corpus authorizes us to "dispose of the matter as law and justice require." 28 U.S.C. § 2243; *accord Paxton v. Ward*, 199 F.3d 1197, 1219 (10th Cir. 1999). The statute vests us "with the largest power to control and direct the form of judgment to be entered in cases brought on habeas corpus." *Douglas v. Workman*, 560 F.3d 1156, 1176 (10th Cir. 2009) (alteration omitted) (quoting *Capps v. Sullivan*, 13 F.3d 350, 352 (10th Cir. 1993)) (internal quotation marks omitted).

In Appeal No. 10-6076, we **AFFIRM** the judgment of the district court denying habeas relief as to claims arising out of Mr. Hooks's *Atkins* trial. In Appeal No. 03-6049, we **AFFIRM** the judgment of the district court denying habeas relief as to Mr. Hooks's 1989 conviction, but **REVERSE** the judgment of the district court denying habeas relief as to his sentence. We therefore grant the writ with respect to Mr. Hooks's sentence, *subject to the condition* that the State of Oklahoma resentence him within a reasonable time.

03-6049, 10-6076, *Hooks v. Workman*

**GORSUCH, J.**, concurring in part and dissenting in part:

I agree with much more of the court's very fine opinion than not, and I join all but its discussion whether Mr. Hooks enjoyed a constitutional right to counsel at his post-conviction *Atkins* proceeding, *see* Maj. Op. § II.C.5.a, and its holding that Mr. Hooks's counsel was constitutionally ineffective at the sentencing phase of his original trial, *see* Maj. Op. § II.D.2.

I

On the first score, Mr. Hooks argues that he did not receive effective assistance from his appointed counsel at the post-conviction *Atkins* proceeding convened to determine whether he is mentally retarded. *See Atkins v. Virginia*, 536 U.S. 304, 321 (2002). In reply, and after a careful examination of counsel's performance, my colleagues hold that any plausibly applicable constitutional standard for effective representation was satisfied. *See* Maj. Op. § II.C.5. With this holding I agree.

But because I agree with this much, I would decline Mr. Hooks's invitation to address the novel constitutional question whether a right to counsel exists in post-conviction *Atkins* proceedings, a question my colleagues take up in § II.C.5.a. I would decline to offer an opinion on this question because there is no need to do so and many reasons to hesitate.

Caution is always warranted when venturing down the road of deciding a weighty question of first impression and recognizing a previously unrecognized constitutional right. And surely caution must be doubly warranted when nothing turns on it. After all, "[a] fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Assn.*, 485 U.S. 439, 445 (1988); *see also Burton v. United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.")*; NLRB v. Int'l Bhd. of Elec. Workers*, 481 U.S. 574, 591 n.15 (1987) (separately noting that a statement "unnecessary to the disposition" is "dictum"); *United States v. Villarreal-Ortiz*, 553 F.3d 1326, 1328 n.3 (10th Cir. 2009) (same). And given all members of the panel agree with certainty and comparative ease that Mr. Hooks's claim fails even assuming a constitutional right to counsel exists in a post-conviction *Atkins* proceeding, offering any view on whether such a new constitutional right should be recognized is simply unnecessary in this case.

Adding caution to caution to my mind is the fact it's not obvious an opinion on the question Mr. Hooks poses will *ever* be necessary. Today, *Atkins* challenges are routinely handled before or at trial with the constitutionally assured aid of counsel. Mr. Hooks's *Atkins* claim was presented on collateral review only because *Atkins* issued after his conviction became final and *Atkins* represents what this court has called one of the "rare instances in which the Supreme Court has announced a new rule of constitutional law that

it has also expressly made retroactively applicable to cases on collateral review." *Ochoa v. Sirmons*, 485 F.3d 538, 540 & n.2 (10th Cir. 2007). So it is that the number of cases like Mr. Hooks's — applying *Atkins* in collateral proceedings and still working their way through the federal courts a decade later — surely isn't overwhelming. And for that vestigial lot it isn't clear whether we will ever have to decide whether the right to effective assistance of counsel attaches. As in this case, counsel in these other lingering cases very well may have been provided and themselves provided effective assistance. Of course, if and when the constitutional question actually makes a difference in one of these cases, I have no doubt this court will stand open to argument and ready to judge. But it's unclear we will ever have to do so and it is clear we do not have to do so today.

Finally, my reluctance to reach the novel constitutional question is informed by the fact that it is pitted with problems. Those problems begin with the fact our approach to the question in this particular case comes by way of AEDPA, as my colleagues acknowledge. So the question before us isn't "just" whether to recognize an entirely new constitutional right to counsel in post-conviction *Atkins* proceedings. It's whether such a right is already "clearly established" by the holdings of the United States Supreme Court. 28 U.S.C. § 2254(d)(1).

And for his part, Mr. Hooks fails to explain how we might confidently say so much. After all, when it comes to *post*-conviction habeas proceedings, the Supreme Court's teachings have been consistent, clear, and categorical — holding that a

constitutional right to counsel does *not* exist. *Murray v. Giarrantano*, 492 U.S. 1, 10 (1989) (plurality); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Time and again, the Supreme Court has told us that "the right to appointed counsel extends to the first appeal of right, and no further." *Finley*, 481 U.S. at 555. Post-conviction review, the Court has explained, simply "is not part of the criminal proceeding itself, [but] is . . . civil in nature," *id*. at 557, and the Sixth Amendment's right to counsel simply "does not govern civil cases," *Turner v. Rogers*, 131 S. Ct. 2507, 2516 (2011). So, far from contradicting Supreme Court holdings, the idea that Mr. Hooks lacked a Sixth Amendment right to counsel in the course of a post-conviction *Atkins* proceeding seems, at least on first blush, entirely consistent with (maybe even compelled by) Supreme Court precedent.[1]

To be sure, Mr. Hooks seeks to avoid the force of all this adverse precedent by asking us to recharacterize his post-conviction proceeding as a part of his original criminal prosecution. He begins by noting that he couldn't have brought his *Atkins* claim until after conviction. And because of this — because his habeas petition represented the first place he could've brought his *Atkins* claim — he suggests his *Atkins* proceeding should not be treated as a post-conviction proceeding at all. Instead, he says, we should

---

[1] In *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the Court recently held that the lack of counsel in post-conviction proceedings can, in certain circumstances, constitute cause to excuse a procedural default. But *Martinez* did not displace *Murray* and *Finley*'s rule that appointment of counsel is not constitutionally compelled in collateral proceedings. *Id*. at 1315.

recharacterize it as a *pre*-conviction criminal proceeding where the Sixth Amendment and its right to counsel automatically attaches.

The difficulty here is Mr. Hooks doesn't explain how this recharacterization process is clearly compelled by Supreme Court precedent. In deciding whether to apply a new constitutional rule retroactively, the Supreme Court has always spoken of the question as whether the new rule should apply "*to cases on collateral review*." *See, e.g.*, *Teague v. Lane*, 489 U.S. 288, 300-10 (1989); *see also Ochoa*, 485 F.3d at 540 ("*Atkins . . .* [is] retroactively applicable *to cases on collateral review*." (emphasis added)). Neither is the fact an important and potentially winning federal claim can be brought only in habeas ordinarily enough to undo a conviction and transmogrify a habeas proceeding back into a pre-conviction criminal proceeding. If the rule were otherwise — if the world were as Mr. Hooks suggests it should be — habeas petitioners would have a constitutional right to post-conviction counsel not just for *Atkins* claims but also for *Strickland* claims aimed at appellate counsel or for *Brady* claims based on newly discovered evidence. And that, of course, is not the law. *See Finley*, 481 U.S. at 555. All this suggests that the retroactivity of a new rule applied on collateral review doesn't strip a case of its finality and post-conviction status *unless and until* the new rule or its application requires that the petitioner's conviction or sentence be set aside. Certainly and at the least, Mr. Hooks identifies no clearly established law of the Supreme Court holding otherwise.

This leaves Mr. Hooks to reply only that, if the Sixth Amendment doesn't clearly compel counsel, the Due Process Clause might. But here again unexplained

-5-

complications soon emerge.  The Due Process Clause applies to all kinds of proceedings — including other post-conviction proceedings, *see, e.g.*, *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) — without compelling a right to counsel.  To be sure, Mr. Hooks suggests his case is different because an intellectually disabled death row inmate won't as a practical matter be able to press an *Atkins* claim without the benefit of counsel.  But the Supreme Court in *Murray* expressly rejected the notion that death row prisoners have a due process right to post-conviction counsel, and the Court did so well aware that appointed counsel is not infrequently the practical difference between success and failure in securing post-conviction relief.  *See* 492 U.S. at 14-15 (Kennedy, J., concurring in the judgment).  Take, for example, the winning ineffective assistance of counsel claim in Mr. Hooks's own case.  Today, the court sets aside Mr. Hooks's death sentence after concluding he was denied effective assistance of counsel at the sentencing phase of his original trial.  It is difficult, maybe impossible, to imagine how Mr. Hooks would have been able to bring such a highly complex claim without the assistance of post-conviction counsel.  Yet, no one suggests due process guaranteed Mr. Hooks the right to post-conviction counsel to bring *that* claim.  Now, maybe there's some way to distinguish away all other complex post-conviction claims and treat *Atkins* claims uniquely.  But Mr. Hooks never explains to us how a contrary view, one consistent with the Court's existing direction in *Murray*, might be overturned under AEDPA as an unreasonable application of existing Supreme Court precedent.

In raising these concerns, I hardly mean to suggest that competent counsel shouldn't be provided in the lingering cases where *Atkins* is enforced through collateral proceedings. Indeed, counsel in these circumstances clearly serve a critical function, and the State of Oklahoma recognized as much by providing Mr. Hooks with a lawyer in his *Atkins* proceeding. A lawyer who, this court acknowledges, met every standard the Constitution might conceivably command even in a pre-conviction setting. *See Murray*, 492 U.S. at 14-15 (Kennedy, J., concurring in the judgment) (observing that "[t]he requirement of meaningful access can be satisfied in various ways," including through state initiatives like Oklahoma's, and that "judicial imposition of a categorical remedy . . . might pretermit [similarly] responsible solutions being considered in Congress and state legislatures."). Neither in raising these concerns do I mean to indicate how this court should rule if and when the question of constitutional right actually matters. I simply and respectfully mean to explain only the many and varied reasons that cause me to hesitate about venturing an opinion today on a constitutional question when its answer does not matter.

II

My other point of departure from the court's thorough opinion is its conclusion that Mr. Hooks's trial counsel was constitutionally ineffective at the sentencing phase of his original trial. *See* Maj. Op. § II.D.2. As my colleagues observe, our review on this question is *de novo* because the state courts never passed on its merits. Even so, I agree with the district court's assessment that counsel's alleged deficiencies did not prejudice

-7-

Mr. Hooks. Like the district court, I would hold that there is no "reasonable probability" that, had counsel acted just as Mr. Hooks now wishes, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

Mr. Hooks first complains that counsel failed to produce certain evidence about his family history. But that history is a mixed bag for him. Mr. Hooks says, for example, that the jury should have learned his father abused him. But the evidence of abuse is based on testimony that Mr. Hooks's father disciplined him by spanking him with a belt and, on one occasion, when Mr. Hooks was talking while his father was attempting to say grace before a meal, his father smacked him very hard in the mouth. Fed. Evid. Hr'g at 14-15. According to Mr. Hooks himself, for the most part he had a "great" relationship with his father and "liked to be around him." *Id.* at 44, 47. And Mr. Hooks's mother remembered her husband generally as a "wonderful person" and "excellent provider." *Id.* at 11. Mr. Hooks separately but relatedly complains that the jury didn't hear about his premature birth, his father's death in a car crash and his half-brother's death in a motorcycle accident, his father's abuse of his mother, or his family's frequent moves and the difficulty he had in school. But these difficulties, too, while no doubt very real, are a far cry from the sort of "nightmarish" personal histories that courts have faulted counsel for failing to illuminate at trial. *Williams v. Taylor*, 529 U.S. 362, 395 & n.19 (2000); *see also Wiggins v. Smith*, 539 U.S. 510, 516-17, 534-35 (2003) (discussing unproduced evidence of "physical torment, sexual molestation, and repeated rape" as well as the fact

that the defendant's "mother, a chronic alcoholic, frequently left [the defendant] and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage"); *Rompilla v. Beard*, 545 U.S. 374, 391-92 (2005) (discussing unproduced evidence the defendant suffered fetal alcohol syndrome, was mentally retarded and repeatedly beaten, and suffered an extraordinarily deprived childhood).

Given the comparatively equivocal nature of the unproduced evidence in this case, it is hard to see how it would have mitigated for anyone on the jury the fact Mr. Hooks brutally beat his pregnant wife to death over the course of approximately two hours, leaving her body barely recognizable and his unborn child dead. Or how it would have offset the other aggravating evidence that Mr. Hooks previously robbed a liquor store and routinely beat his wife and two other girlfriends, causing (another) one of them to have a miscarriage. Much more likely, any attempt to blame Mr. Hooks's crimes on his surely imperfect but not particularly unusual childhood would have done him more harm than good with the jury.

The same sort of problem recurs with all the other facts Mr. Hooks now says his lawyer should have presented.

After the prosecution presented aggravating evidence about his liquor store robbery, Mr. Hooks says his trial counsel should have introduced evidence that he (Mr. Hooks) confessed the crime to his mother, who then forced him to turn himself in. But none of this undermines the fact that Mr. Hooks committed the robbery, or suggests he

would have confessed without his mother's influence. And much of the other testimony that Mr. Hooks claims his mother could have provided about the robbery — that Mr. Hooks didn't bring any gun to the robbery but found one in the store and took it home, and that the clerk cut her hand "accidentally" when Mr. Hooks knocked a knife lying on the counter onto the floor — would have been inadmissible hearsay, and some of it of questionable credibility at that.

When it comes to the mitigating evidence about his mental health, Mr. Hooks faults his counsel for calling Dr. Murphy to testify that he suffered from severe mental illnesses instead of another psychologist who would have diagnosed organic brain damage. It's doubtful, however, if this amounted even to deficient performance, given that it appears Dr. Murphy was virtually the only available psychiatrist willing to testify. Fed. Evid. Hr'g at 175. But even assuming the performance here was deficient, it's still hard to see how a diagnosis of organic brain damage would have been materially more helpful than the mental health evidence Dr. Murphy offered. Dr. Murphy testified, after all, that Mr. Hooks was "borderline mentally retarded" and that he suffers from a chronic psychotic disorder. 3 Trial Tr. at 518-22, 528. The doctor explained that this disorder causes Mr. Hooks to have "recurrent repeated episodic breaks with his ability to tell reality from fantasy." *Id*. at 518, 521-22. Dr. Murphy then expressly proceeded to "connect the dots" between this mental illness and Mr. Hooks's murder. He testified that, given Mr. Hooks's chronic psychotic disorder, it was very unlikely Mr. Hooks could have murdered Ms. Blaine "in a fully rational, cold-blooded, premeditated fashion." *Id.* at 529.

And he suggested that, at the time of the murder, Mr. Hooks must have been in a "catatonic" and "extremely regressive state" which caused him to have poor impulse control and left him less than competent. *Id.* In light of all this, it's hard to see how Mr. Hooks might have been aided significantly by a diagnosis of organic brain damage. In fact, testimony along those lines would have been seriously suspect (and so potentially harmful to Mr. Hooks) given that medical records from a 1982 hospitalization — long after the car accident which, along with Mr. Hooks's premature birth, allegedly caused organic brain damage — disclose that the doctors found *no* evidence of organic brain injury. *Id.* at 532-34.

Mr. Hooks separately asserts that Dr. Murphy's testimony was ineffectual because the doctor "knew almost nothing about Mr. Hooks's case." Maj. Op. at 95. But while Dr. Murphy admitted that he had not read the police reports or viewed Mr. Hooks's videotaped confession, these are hardly the only ways of learning about Mr. Hooks's crime. In fact, Dr. Murphy's testimony reflects that he discussed the crime both with Mr. Hooks and with trial counsel and knew all the pertinent details. 3 Trial Tr. at 458-59, 527, 531. Similarly, Mr. Hooks complains that Dr. Murphy's testimony was undercut by his statements that Mr. Hooks would, at times, become "crazy" and "violent." But Mr. Hooks was undeniably "very, very violent" when he beat his wife to death, and it was a perfectly reasonable — even a wise — mitigation strategy to have Dr. Murphy admit this fact and argue the behavior was attributable to Mr. Hooks's mental illness and incompetence rather than a product of deliberation.

Much the same holds true with his counsel's acknowledgment during the sentencing phase that Mr. Hooks was a dangerous person. Mr. Hooks complains that his counsel shouldn't have admitted as much. But counsel has explained that it was his strategy to make this admission in an attempt "to build some credibility with the jury," Fed. Evid. Hr'g at 194, and Mr. Hooks has failed to overcome the "strong presumption" that this strategy was reasonable. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984). By this point in the trial, after all, counsel faced a mountain of evidence (a murder conviction and much evidence of other violence) suggesting Mr. Hooks often resorted to brutal force. It wasn't unreasonable for counsel to acknowledge the unavoidable and then seek to defuse it by explaining how and why it didn't warrant the death penalty. And that's exactly what counsel did. Immediately after acknowledging his client's violent tendencies, counsel argued they were the product not of malicious deliberation but mental illness. 3 Trial Tr. at 505. And counsel then proceeded to remind the jury that if they remained concerned, they had the option of life without parole, arguing that Mr. Hooks wouldn't be a threat in prison because he had no problems with fellow prisoners or guards during a previous incarceration. *Id.* This strategy — acknowledging the facts and seeking to work faithfully within their parameters to suggest reasons why the death penalty isn't warranted — surely amounts to reasonable professional conduct. It would do a great deal more to undermine than advance the Sixth Amendment's right to effective assistance to require lawyers to become ostriches and feign ignorance of the facts before the jury or risk being held incompetent. All of us

-12-

lawyers and judges, after all, have to work with the hard facts as well as the easy ones. *See Hooker v. Mullin*, 293 F.3d 1232, 1246-47 (10th Cir. 2002) (counsel not deficient in stipulating to two aggravating circumstances that the jury would have found anyway when this concession was a strategic decision to preserve credibility).

These are all the alleged deficiencies of trial counsel Mr. Hooks cites in his effort to overturn his death sentence. There are no more. Respectfully, I agree with the district court that they are not sufficient to warrant displacing the jury's considered sentence and I would affirm the district court's decision in full.